**In re EL PASO REFINERY, L.P., Debtor.**

**Andrew B. KRAFSUR, Trustee for El Paso Refinery, L.P., Plaintiff,**

v.

**SCURLOCK PERMIAN CORPORATION, Defendant.**

**Bankruptcy No. 94–30051–LMC.
Adv. No. 94–3016.**

United States Bankruptcy Court,
W.D. Texas,
El Paso Division.

Feb. 2, 1995.

Margaret A. Christian, Kemp, Smith, Duncan & Hammond, P.C., El Paso, TX, for Andrew B. Krafsur, Trustee.

R. Glen Ayers, Jr., Vinson & Elkins, L.L.P., Washington, DC, for Scurlock Permian Corp.

### MEMORANDUM DECISION ON TRUSTEE'S COMPLAINT TO RECOVER PREFERENTIAL TRANSFER

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for consideration the complaint of Andrew B. Krafsur, Trustee ("Trustee") for El Paso Refinery L.P. ("EPR"), to recover preferential transfers, 11 U.S.C. § 547, from Scurlock Permian Corporation ("SPC"). After hearing thereon, the court took this matter under submission. This decision now resolves this matter.

### Jurisdiction

The Bankruptcy Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a), (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

### Factual Background

EPR operated a high conversion refinery in El Paso, Texas, and distributed gasoline, jet fuel, diesel and other petroleum products. Permian Operating Partnership supplied crude oil to EPR's refinery operations for a number of years. SPC was formed July 7, 1991 by acquisition and merger with Permian.

All of the crude oil supplied to EPR was sold on credit. The formal terms of the supply agreement were established prior to the creation of SPC, and were never formally amended throughout the relationship. SPC assumed the credit sales contract after the merger. Payment for crude oil was due on the 20th of each month following the month of delivery, and Permian used to invoice EPR accordingly. The credit to EPR was secured by, *inter alia,* a first lien on accounts receivable, inventory, contract rights, and proceeds, granted in 1986. SPC succeeded to those liens.

After the merger, SPC entered into an intercreditor agreement with Bank Brussels Lambert ("BBL"), giving BBL an interest in SPC's first lien. The agreement provided that the collateral secured by the lien was to be shared on a ratable basis, 54.53% for SPC and 45.47% for BBL. Before July 1, 1991, EPR had usually paid Permian on time or even early. Most of the money used to pay Permian, however, was borrowed from BBL, and by July 1991, BBL had advanced over $25,000,000.00 to EPR. Almost immediately after the merger, EPR began to fall behind with SPC. By the end of September 1991, EPR was "past due" to SPC by $37,450,-000.00. EPR also owed BBL approximately $37,000,000.00 by this time. At SPC's re-

quest, in September 1991, EPR began to pay weekly instead of monthly.

SPC, deciding that it could not expose itself to this level of debt, insisted on further protections. On November 12, 1991, at SPC's insistence, EPR asked BBL to issue an irrevocable letter of credit in favor of SPC, in the amount of $5,000,000.00, to secure repayment of any advances by SPC in excess of the $37,450,000.00 already past due, plus interest, for further continued shipments of crude oil. EPR gave BBL a contractually prioritized first lien on the refinery's hard assets to secure this letter of credit (and to induce its issuance).

On March 11, 1992, once again at SPC's insistence, EPR arranged for the issuance of another irrevocable letter of credit from BBL in favor of SPC, this one for $6,000,000.00. It too was designed to secure sales of crude by SPC to EPR. So long as sales of crude did not cause EPR's total indebtedness to SPC to exceed the $42,420,000.00 then owing to SPC plus the amount of this additional letter of credit, SPC would continue to ship crude to EPR. SPC, BBL, and other lenders participated in the loan for the $6,000,-000.00 letter of credit, which loan was secured by another lien on the refinery's hard assets.

Even with these letters of credit in place, SPC was still not comfortable (or, from the debtor's point of view, satisfied). SPC demanded that EPR make its crude oil payments on a daily basis, via wire transfers from EPR's bank in El Paso to SPC's bank in Houston. SPC also leased the crude oil storage tanks adjacent to the refinery, so that EPR would *no longer have any standing inventory* of crude oil, but would have to request deliveries literally on a daily basis for its daily needs.[1] Title and risk of loss thus passed to EPR only when the crude oil passed through the outlet valve on the pipes, giving SPC complete control over the flow of crude oil into the refinery, and reducing EPR's reserves effectively to zero.

These three steps allowed SPC to closely monitor the credit position of EPR at all times. Crude oil was supplied to EPR on an as needed basis, provided that SPC was satisfied that the amount of crude oil credit advanced that day would be "protected" by either a cash payment or a cushion created by the letter of credit, or a combination of both.[2] Even with these daily payments, however, EPR's debt to SPC continued to grow. EPR owed SPC $37,450,000.00 by late September or early October 1992. The debt grew to $42,420,000.00 by March 1992, and by July 1992, had again increased to over forty-five million dollars. The amount owed to SPC on the date of the petition was $42,-498,877.00, but only because, by then, SPC presented one of the letters of credit for payment.

On October 23, 1992, EPR filed a voluntary petition under chapter 11 of the Bankruptcy Code. Since that original filing, the case has been converted to chapter 7. An examiner with expanded powers was appointed during the chapter 11 case, but EPR was never terminated as debtor in possession, and so had the authority to pursue avoidance actions. EPR filed this preference suit against SPC, and, after the conversion to chapter 7, the chapter 7 trustee was formally substituted as plaintiff by court order on September 17, 1994.

The parties have stipulated to many of the facts. They agree that the preference period is the 90 days immediately preceding the bankruptcy filing, July 24, 1992 to October 22, 1994, that, at all times during the preference period, EPR was insolvent, that SPC is a creditor of EPR, and that SPC is now and was throughout the preference period an undersecured creditor.

The parties have also stipulated to what payments the Trustee is attempting to recov-

---

1. Crude oil was delivered nightly via pipes connecting the tanks to the refinery.

2. SPC used the letters of credit to set the limits on its crude oil advances. If the amount owed to SPC in excess of the $37,450,000.00 was less than the $11 million which they could access under the letters of credit, SPC would provide new crude oil supply. Payments to SPC would reduce the "old debt" which EPR was bound to pay, and thereby also increasing the amounts available to SPC under the letter of credit.

er.[3] During the preference period, payments were made to SPC by wire transfer on a near daily basis; the amounts varied from as little as $500,000.00 to as much as $3,500,000.00. The total of these daily payments was approximately $82,000,000.00. It is these daily payments that the Trustee seeks to recover as preferences. SPC, of course, alleges that these payments were not preferential in the first place, and also that, if they were, it has valid affirmative defenses.

## Discussion

### I. PREFERENCE PAYMENTS

#### A. THE ELEMENTS OF A PREFERENCE

To recover payments as preferential transfers, the Trustee must establish the elements of a preference set out in section 547(b). That section states:

a trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

■ A trustee's ability to avoid these kinds of transfers promotes equality of distribution, by ensuring that all creditors of the same class receive the same pro rata share of the debtor's estate. *Matter of Smith,* 966 F.2d 1527 (7th Cir.), *cert. dismissed,* —— U.S. ——, 113 S.Ct. 683, 121 L.Ed.2d 604 (1992). The power to avoid preferences also reduces the incentive for creditors to rush in and dismember a financially unstable debtor. *Id.* Neither the purpose of the transfer, nor the "state of mind" of either party is relevant. *T.B. Westex Foods, Inc. v. FDIC (Matter of T.B. Westex Foods, Inc.),* 950 F.2d 1187, 1195 (5th Cir.1992). The focus instead must be on the effect which the transfer has had upon the debtor's estate. *T.B. Westex Foods, Inc.,* 950 F.2d at 1195 (citing 4 L. KING, COLLIER ON BANKRUPTCY ¶ 547.01 (15th ed. 1991)).

■ The trustee bears the initial burden of establishing all five elements of a preference action. *Union Bank v. Wolas,* 502 U.S. 151, 154–55, 112 S.Ct. 527, 529, 116 L.Ed.2d 514 (1991); 11 U.S.C. § 547(g). Should the trustee meet this burden, the burden then shifts to the defendant to establish the elements of one of the exceptions contained in section 547(c). 11 U.S.C. § 547(g); *see also Union Bank,* 502 U.S. at 153–55, 112 S.Ct. at 529.[4]

■ The relevant date for determining whether a creditor has received a preferential payment is the date of the filing of the bankruptcy petition. *In re Tenna Corporation,* 801 F.2d 819 (6th Cir.1986); *Sloan v. Zions First Nat'l Bank, N.A. (In re Castletons, Inc.),* 154 B.R. 574, 579 (Bankr.D.Utah

---

3. During the preference period, SPC was paid from three sources. First it received amounts on a daily basis via wire transfer. Second, on August 20, 1992, SPC drew $5,000,000.00 from the smaller letter of credit. Third, SPC swept an equity account which contained over $716,695.00 on October 20 and 21, 1992. The Trustee does not seek to recover the latter two transfers.

4. Of course, the defendant also shoulders the burden of going forward with evidence to rebut the trustee's case in chief, though it does not have the burden of proof. Thus, for example, were the trustee to put forward sufficient evidence to make out a *prima facie* case for the fifth element of her cause of action (i.e., that the transfer enabled the creditor to receive more than it would have received in a chapter 7 liquidation), the burden would then shift to the defendant to come up with evidence sufficient to call into question whether the trustee had sustained her burden of proof.

1992). This date controls both the insolvency and the greater recovery elements.

In the present case, the Trustee's burden has been lightened considerably by the stipulations of the parties. There is no dispute that (1) the amounts paid during the preference period were a "transfer of an interest of the debtor in property," that (2) SPC was at all relevant times an undersecured creditor, that (3) the payments were made on "account of an antecedent debt,"[5] that (4) EPR was at all relevant times insolvent,[6] and that (5) all the contested payments were made "on or within 90 days before the date of the filing of the petition." These stipulations establish the first four of the five elements of section 547(b).

## B. THE FIFTH ELEMENT

There still remains the fifth element, which requires a trustee to show that the transfer allowed the creditor to receive more than it would have received: 1) if the case were a case under chapter 7; 2) the transfer had not been made; and 3) the creditor received payment on its debt to the extent provided by the provisions of this title. 11 U.S.C. § 547(b)(5). In other words, a court must determine how things would have been had the transfers not been made, and the creditor had instead received its payment pursuant to the distribution scheme of the Bankruptcy Code.

### 1. THE GREATER PERCENTAGE TEST (IN GENERAL)

The fifth element does not actually require a full-blown reconstruction of the

estate and liquidation analysis. A trustee need only prove that, as a result of the transfer, the creditor received a *greater percentage recovery* on its debt than it would otherwise have received had it looked solely to distribution from the chapter 7 estate for its payment. *Palmer Clay Products Co. v. Brown,* 297 U.S. 227, 56 S.Ct. 450, 80 L.Ed. 655 (1936); *see* V. Countryman, *The Concept of Avoidable Preference in Bankruptcy,* 38 VAND.L.REV. 713, 735–736 (1985).

The rationale behind the "Greater Percentage Test" is simple. A creditor who receives payment pre-petition *de facto* receives 100% payment on the debt which it is owed.[7] If that same creditor would not receive 100% payment on the debt in a chapter 7 liquidation, the creditor has been preferred by the payment, because it allowed the creditor to receive a greater percentage of its debt than it would be entitled to receive in the chapter 7 process, to the disadvantage of other similarly situated creditors.

The test is most easily understood in the context of an ordinary unsecured creditor that receives payment prepetition. We need only compare what such a creditor received via the transfer (a dollar for dollar satisfaction of unsecured debt), with what the same creditor would have received had that payment been retained by the estate, then redistributed with the remainder of the estate's assets to all similarly situated unsecured creditors. If the estate would not have had

---

5. The parties have stipulated that:

 According to the agreement of the parties, payment for crude oil was due the 20th day of the month following the month of delivery. The payments made by EPR to SPC during the preference period were applied by SPC to the oldest outstanding invoices.

6. SPC at trial attempted to put on evidence that the estate would have enough money to pay SPC in full, to rebut the *fifth* element of the Trustee's case. The Trustee complained that SPC was trying to escape its stipulation as to insolvency. The stipulation goes only to the *third* element of the Trustee's case, however. SPC was merely attempting to counter the trustee's argument that SPC had received more than it otherwise would have received in a chapter 7 liquidation. Says

SPC, there are claims *below* SPC (the claims of EPR's limited partners) that will not be paid in full, so its stipulation as to insolvency is still valid. Whether SPC's factual contention has merit is discussed later in this decision.

7. It does not matter whether the prepetition payment pays off the debt in full. That is not the issue. What is relevant is that the creditor can retire $1.00 of debt with $1.00 of payment. If a subsequent bankruptcy would force the creditor to retire $1.00 of debt with anything less than $1.00 in payment (as might happen if there are insufficient assets to pay all similarly situated creditors in full, for example), then the prepetition transfer conferred on the creditor a greater percentage recovery than would have the bankruptcy's distribution scheme had the transfer not been made.

enough to pay all unsecured creditor claims 100 cents on the dollar, then the creditor will have received a greater percentage via the transfer than it would otherwise have received via the bankruptcy process, and element five of a preference action will have been satisfied.

### 2. THE GREATER PERCENTAGE TEST (SECURED CREDITORS)

■ When the creditor is secured, the test has a few twists to it. If the creditor is *fully* secured or *over* secured (i.e. the value of the assets subject to the creditor's security interest are equal to or greater than the debt owed to that creditor), the creditor who receives a prepetition transfer will then recover no greater a percentage than it would have received in bankruptcy anyway, and so will not be deemed to have received a preference. *Flynn v. Midamerican Bank and Trust Co. (In re Joe Flynn Rare Coins, Inc.)*, 81 B.R. 1009, 1018 (Bankr.D.Kan.1988); *In re Fitzgerald*, 49 B.R. 62, 65 (Bankr.D.Mass.1985); 4 L. KING, COLLIER ON BANKRUPTCY, ¶ 547.09, pp. 547–43 (15th ed. 1990). This type of creditor would receive *100%* payment in a chapter 7 liquidation (because it is fully secured), so whatever it received via the transfer it would have received anyway in bankruptcy. *See* 11 U.S.C. § 725; *see also* COLLIER, supra. This is not our case, however. SPC is an undersecured creditor.

### 3. THE GREATER PERCENTAGE TEST (UNDERSECURED CREDITORS)

■ What about the creditor with a security interest in property owned by the debtor, the value of which is insufficient to satisfy the amount owed to the creditor? Whether a transfer to such a creditor will trip the "Greater Percentage Test" will depend on (1) *to* what claim the payment is applied (the *application* aspect) and (2) *from* what source the payment comes (the *source* aspect). This is so because, in bankruptcy, such a creditor holds two different claims, each of which is entitled to different treatment in bankruptcy. The first is its claim against the property securing the payment of the debt. The second is the amount of debt which exceeds the value of that property, which is by definition "unsecured." *See* 11

U.S.C. § 506(a). If the payment is *applied* to the unsecured claim of the creditor, then in the usual situation the creditor will have received more than it received in a chapter 7 liquidation, triggering the Greater Percentage Test and satisfying the trustee's burden on the fifth element. By the same token, if the *source* of the payment is the creditor's own collateral, then the creditor will have received no more than it would have received in chapter 7 anyway, so that the Greater Percentage Test will *not* be triggered, and the trustee will have failed to sustain her burden on the fifth element. Even a payment which has been *applied* to the unsecured claim of an undersecured creditor will not trigger the test if the *source* of the payment is the creditor's own collateral. Thus, both aspects of the test must be examined before a court can safely conclude that the Greater Percentage Test has or has not been satisfied in the case of an undersecured creditor such as SPC.

### (A) THE "APPLICATION" ASPECT OF THE GREATER PERCENTAGE TEST

Turning first to the "application" aspect, if a payment received by an undersecured creditor is applied to the unsecured portion of the debt, then the effect of the transfer will be similar to the effect on the ordinary unsecured creditor who receives such a payment. Like the unsecured creditor, the undersecured creditor who has applied a transfer to the unsecured portion of its debt will have recovered a greater percentage on this claim if the estate cannot pay unsecured creditors 100% of these claims. *Flynn v. Midamerican Bank and Trust Co. (In re Joe Flynn Rare Coins, Inc.)*, 81 B.R. 1009, 1018 (Bankr.D.Kan.1988); *In re Fitzgerald*, 49 B.R. 62, 65 (Bankr.D.Mass.1985); 4 L. KING, COLLIER ON BANKRUPTCY, ¶ 547.09, p. 547–43 (15th ed. 1990).

If the creditor applies the payment to the *secured* portion of the debt, on the other hand, the creditor effectively releases a portion of its collateral from its security interest (i.e., its secured claim is reduced, freeing up a corresponding amount of collateral). Now, the effect of the transfer is quite like that received by a fully secured creditor. The

payment will not have enabled the creditor to receive any *greater percentage* than it would have received in bankruptcy anyway, because, when payment was applied, a corresponding amount of collateral was released from the security interest, becoming at least theoretically available for bankruptcy distribution to unsecured creditors. If the creditor does not actually release collateral upon application of the payment, however, then the payment is *ipso facto* a payment on the unsecured portion of the claim. *See* 4 L. KING, COLLIER ON BANKRUPTCY, ¶ 547.09, p. 547–43 note 9 (15th ed. 1990).

There is no evidence in the record that SPC ever released collateral when it received payments from EPR. More to the point, it cannot be presumed to have done so. The security instruments provide that SPC's security interests encumber "any and all indebtedness," meaning that, so long as there was indebtedness in excess of collateral, all collateral was encumbered. If a given payment reduced total indebtedness, but failed to reduce it below the value of the collateral, then, per the terms of the security agreement, all of the collateral remained encumbered by all the debt. The payment can only be said to have reduced the unsecured portion of the debt, absent affirmative evidence that collateral was actually released by the creditor upon receipt of payment. This sort of thing does happen, of course, especially in the case of mortgage lenders who finance developers of single family housing. But there is no evidence in this case that such releases of collateral ever occurred here. Given the language of the security instruments, it was not for the Trustee to prove that such releases did not occur, but rather for SPC to prove that they did. There is no such proof here. Given the nature of the loan here, one would not expect there to have been releases of collateral anyway. This is just not that kind of loan. The fair presumption is that, from the application aspect, these payments trigger the Greater Percentage Test and satisfy the trustee's burden.

SPC counters that, even if these payments *were* applied to its unsecured claim, the Greater Percentage Test will not be triggered, because, despite the estate's overall insolvency, creditors in SPC's position might expect to be paid in full.[8] The competent evidence presented to the court will not sustain that contention, however. The Trustee testified that the estate's assets will not be sufficient to satisfy the unsecured claims, even if these monies had been retained by the estate and were now available for distribution. All that SPC offered in rebuttal was the suggestion that certain state court lawsuits now being pursued by the Trustee against SPC might well generate enough to pay all unsecured creditors in full. All that SPC offered in support of this proposition were the bankruptcy schedules and a reference to the state law complaint. That is not enough evidence to cast any serious doubt on the Trustee's overall evaluation of the value of the estate's assets and the likely distribution to be made to unsecured creditors. The facts and stipulations in this case thus establish that, insofar as the "application" aspect of the greater percentage test is concerned, a preference may have occurred. This does not conclude our analysis, however. We must still examine the source aspect.

### (B) THE "SOURCE" ASPECT OF THE GREATER PERCENTAGE TEST

Even if the payment in question was applied to the unsecured portion of an undersecured creditor's claim, the creditor will not be deemed to have received a greater percentage as a result of the payment if the *source* of the payment is the creditor's own collateral. A creditor who merely recovers

---

8. The purpose of the contention is to rebut the Trustee's allegation that, assuming payments *were* applied to the unsecured portion of SPC's claim, SPC received more than it would have received had the payments been redistributed via the chapter 7 process. Notwithstanding the estate's stipulated insolvency, a given creditor may be high enough up on the priority ladder that it could expect to be paid in full even though creditors lower down receive less than full payment.

This most frequently occurs in cases involving payment to taxing authorities, which enjoy a priority junior only to administrative claims. Here, SPC maintains that the estate's overall insolvency may be visited on the holders of limited partnership interests, leaving open at least a theoretical possibility that a class of unsecured creditors senior to such interests might still be paid in full.

its own collateral receives no more as a result than it would have received anyway had the funds been retained by the debtor, subject to the creditor's security interest. Upon bankruptcy, the selfsame collateral would simply be returned to that creditor by the trustee as part of the chapter 7 administration. 11 U.S.C. § 725; *see Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.),* 161 B.R. 107, 124 (Bankr.E.D.Penn.1993). Even undersecured creditors are entitled to that much in a chapter 7 liquidation. When such a creditor is paid from its proceeds prepetition, it has received precisely what it was entitled to receive anyway in the chapter 7 liquidation—the value of its collateral. Thus, the undersecured creditor receives no more from a receipt of its proceeds than it would have under a chapter 7 liquidation. *See* 4 L. KING, COLLIER ON BANKRUPTCY, ¶ 547.09, p. 547–43 (15th ed. 1990).[9]

The evidence in this case establishes that the *source* of all the alleged preferential payments were "proceeds" of collateral in which SPC held a security interest.[10] However, this case contains peculiar facts that distinguish it from the usual receipt-of-proceeds case. Here, SPC entered into an intercreditor agreement with Bank Brussels Lambert (BBL) long before the preference period, in which SPC agreed to "share" its first lien security interest in inventory, accounts receivable, contract rights and proceeds with BBL. EPR appears not to have been a party to this agreement, and BBL appears not to have held any independent perfected security interest in this particular collateral. What impact, if any, does this agreement

have on our analysis of the source aspect of the greater percentage test?

Recall that in the usual situation, a transfer of an undersecured creditor's own proceeds will not be preferential because the "source" of the transfer is the creditor's collateral, which the creditor would get back anyway via the chapter 7 distribution process. The intercreditor agreement could alter this "usual outcome" in one of two ways. First, if a trustee can enforce the intercreditor agreement in the bankruptcy case, then SPC would not receive 100% of the proceeds it received via the prepetition transfers. The terms of the intercreditor agreement would dictate that a percentage of those proceeds (45.47%, to be exact) ought to be delivered to BBL. SPC would thus have received more via the transfers than it would have received in the chapter 7 liquidation, satisfying the fifth element of the Trustee's preference action.

Alternatively, a percentage of the monies received by SPC (to be precise, 45.47%) might, as a result of the parties' stipulations regarding the *meaning* of the intercreditor agreement, not actually be SPC's proceeds at all. They might be BBL's proceeds, properly deliverable to BBL as part of the chapter 7 distribution process. SPC's receipt of those funds prepetition would thus have permitted SPC to receive more than it would otherwise have received in a chapter 7 liquidation, again satisfying the fifth element of the Trustee's preference action.

We can safely say at this stage, however, that at least that portion of monies paid to SPC prepetition representing *SPC's* collater-

---

**9.** *Collier's* says that a partially secured (undersecured) creditor generally receives preferential payments whenever they are paid pre-petition. The statement refers to the *application* aspect of the Greater Percentage Test. The partially secured creditor generally *applies* this payment to the unsecured portion of its claim, receiving 100% payment on that portion of its claim, while retaining the full value of its lien or security interest. The result is that the partially secured creditor receives 100% payment on a claim which would not receive 100% payment in bankruptcy, and also receives 100% payment on its secured claim as a result of its lien.

*Collier's* recognizes, however, that the situation is different if the *source* of payment is proceeds

of the creditor's collateral, distinguishing between payment from property covered by the creditor's lien (proceeds) and property not covered by the lien (nonproceeds). *Collier's* may not use the precise terminology employed in this opinion, but it does subscribe to the same analytical framework.

**10.** The uncontroverted testimony of SPC's expert, Ms. Kelly Biar, established that all of the funds used to make the payments which are the subject of this preference action were proceeds of a security interest in current assets (inventory, accounts receivable, contract rights, and proceeds). Ms. Biar is a certified public accountant and a manager with Price Waterhouse.

al under the intercreditor agreement (namely, 54.53% of proceeds) was undoubtedly monies that SPC would have received in a chapter 7 liquidation anyway, no matter how we interpret the intercreditor agreement or the parties' stipulations. SPC's liability has thus been reduced, at this stage, to no more than 45.47% of the total transfers, or approximately $37.7 million.

It now remains for us to determine whether the Trustee, by virtue of the intercreditor agreement, can establish the fifth element of his cause of action, under either of the approaches outlined above with regard to this remaining 45.47%. We turn to the first of those approaches in the next section.

(1) IMPACT OF INTERCREDITOR AGREEMENT ON THE SOURCE ASPECT OF THE GREATER PERCENTAGE TEST: CAN THE TRUSTEE ENFORCE THE INTERCREDITOR AGREEMENT?

Turning to the first approach, does the intercreditor agreement impose or confer any rights or obligations on the trustee in bankruptcy that would affect how he would distribute proceeds of accounts receivable and inventory in this bankruptcy case? If the trustee is supposed to (or allowed to) enforce the intercreditor agreement's sharing arrangement, and so distribute proceeds to SPC and BBL in accordance with the proportions set out therein, then SPC will have received more than it would have received in a chapter 7 liquidation had the transfers not been made, the trustee will have satisfied the fifth element, and a preference will have been established. The answer turns on whether the Trustee can enforce the terms of the intercreditor agreement.

A sharing agreement such as this is really a type of "subordination agreement." Creditor A, with a first lien agrees to settle for something less than first position, in favor of Creditor B. Perhaps Creditor A agrees that the Creditor B will receive lien proceeds ahead of Creditor A, or perhaps they agree to divide the collateral on some percentage basis notwithstanding Creditor A's lien priority. Regardless the distribution scheme selected, the effect is the same. One creditor surrenders priority or a portion of its priority, to the advantage of the other creditor.

Section 510(a) of the Bankruptcy Code says specifically that subordination agreements are, in general, enforceable in bankruptcy to the same extent that they are enforceable under applicable nonbankruptcy law. 11 U.S.C. § 510(a); *see Matter of Bobby Boggs, Inc.*, 819 F.2d 574, 579 (5th Cir. 1987); *In re Terrace Gardens Park Partnership*, 96 B.R. 707, 716 (Bankr.W.D.Tex.1989). However, only the parties to the subordination agreement have standing to enforce its terms. *Terrace Gardens Park Partnership*, 96 B.R. at 716; *see also In re Smith*, 77 B.R. 624, 627 (Bankr.N.D.Ohio 1987). Unless the trustee in bankruptcy is a party to the agreement, the trustee lacks standing to insist that the subordination agreement be enforced. *See In re Kors*, 819 F.2d 19, 24 (2nd Cir. 1987); *In re Chicago, South Shore and South Bend Railroad*, 146 B.R. 421, 427 (Bankr. N.D.Ill.1992). The trustee in this case, as successor to EPR, is not a party to the intercreditor agreement, and so lacks standing to enforce the agreement. Only BBL can enforce the agreement.[11] As BBL has no independent lien of record, the trustee would have to make distribution of proceeds of EPR's inventory and accounts receivable only to the lienholder of record—SPC. BBL would then have to pursue its own remedies directly against SPC. The intercreditor agreement, as a subordination agreement, has no impact on the chapter seven distributional process, and would not alter our original conclusion that all the transfers are insulated from preference attack because they all have their source in proceeds of SPC's collat-

---

11. Interestingly, BBL has filed.a proof of claim in this case, in which it has apparently asserted its entitlement to approximately 46% of the collateral securing SPC's debt. The proof of claim has not been introduced into evidence in this case, but even if it had been, the analysis would not change. The trustee would look to the documentation supporting the proof of claim and discover that BBL holds no independently perfected security interest. The trustee would then have to object to the claim, leaving it to BBL to then pursue SPC (perhaps thereby forcing the trustee to file an interpleader to avoid multiple liability). But there is nothing in this analysis that would permit (or obligate) the trustee to enforce the intercreditor agreement in his own name.

eral. However, that is not the end of the matter. We turn to the second scenario to ask about the impact, if any, of the parties' stipulations regarding the meaning and interpretation of the intercreditor agreement for purposes of this case.

(2) IMPACT OF INTERCREDITOR AGREEMENT ON THE SOURCE ASPECT OF THE GREATER PERCENTAGE TEST: EFFECT OF PARTIES' STIPULATION AS TO BBL's SECURITY INTEREST.

 In the usual case, intercreditor agreements do not alter the validity of liens of record *vis-a-vis* third parties, because they represent only a contract between creditors signatory to the agreement. As to third parties (including trustees in bankruptcy), the agreement should be irrelevant, with only the record lienholder holding a lien enforceable against the world. EPR, outside of bankruptcy, had no right to rely on the intercreditor agreement to withhold any proceeds from SPC for the benefit of BBL and were EPR to have withheld monies for BBL, it would have been in default to SPC. The trustee, as successor in interest to EPR, would appear to have no greater rights than EPR.

In the present case, however, the analysis is altered by the parties' stipulations as to how the intercreditor agreement is to be interpreted for purposes of this case. The Trustee and SPC have agreed "that SPC and BBL held *perfected security interests* in EPR's inventory, accounts receivable, and their proceeds (as limited by applicable law), and that they shared any such collateral in the following proportion: 54.53% to SPC and 45.47% to BBL." The parties have thus stipulated that this intercreditor agreement is not simply a contract between two creditors. It has the effect of giving BBL a *perfected security interest* in the collateral and proceeds which are the subject of this analysis, enforceable against SPC.

The fact that BBL does not *actually have* a perfected security interest under state law is irrelevant. The parties have stipulated to the effect of the agreement for purposes of this case. SPC and BBL are to share the collateral in a specific proportion, and SPC by its stipulation has agreed that that proportion (and the intercreditor agreement that gives rise to it) is to be honored in this bankruptcy proceeding. If the transfers made to SPC had remained in the hands of EPR on the date of the bankruptcy filing, they would have been subject to this "perfected security interest" in favor of both SPC and BBL, and the trustee would give SPC just over 54% of those monies, with the balance being distributed to BBL, the holder of a "perfected security interest" in the balance of the collateral in question.

As we have already noted, some 54% of the total proceeds were indisputably SPC's, and its receipt of that proportion of the proceeds is insulated from preference attack. The parties have stipulated, however, that 45.47% of the proceeds were the subject of *another creditor's* security interest—that of BBL.[12] As SPC received those monies, it received monies not sheltered by the source rule, which protects only transfers of a given creditor's *own* collateral. Those funds enabled SPC to recover a greater percentage than it otherwise would have received in a chapter 7 liquidation (in which the stipulation of the parties regarding BBL's security interest would be enforced). The Trustee has thus established the fifth element with respect to 45.47% of the transfers made to SPC during the preference period.

(C) CONCLUSION REGARDING THE GREATER PERCENTAGE TEST

We thus come full circle. In order to satisfy the fifth element of section 547(b), the trustee had but to establish that, as a result of the transfers in question, SPC received a "greater percentage" than it otherwise would

12. It is irrelevant for our inquiry that all the monies transferred to SPC were encumbered by *someone's* security interest. The point of the particularly narrow inquiry in which we have been engaged is not whether, in the broadest sense, the estate was diminished. The point instead is whether a particular creditor was preferred. As it turns out, one creditor's receipt of another creditor's collateral *does* diminish the estate *vis-a-vis* unsecured creditors, but that is not the reason the analysis here is correct. The fifth element of section 547(b) focuses a court's attention on the preferential impact of a given transfer. Without a doubt, transferring one creditor's collateral to another creditor has just such an impact.

have received had the transfers not been made and SPC had instead been required to look to the chapter 7 distribution scheme for payment. Because SPC is an undersecured creditor, the application of the "greater percentage" test required the court to look first to the manner in which the payments were applied and second to the source of those payments. We have determined that, as to the "application" question, the transfers were applied to the unsecured portion of SPC's debt, resulting in SPC receiving a "greater percentage" as a result of the transfers. We then turned to the "source" question, to see whether, as a result of the source of the payments, SPC received only what it would have received in a chapter 7 liquidation anyway. Because the source of these transfers was proceeds of SPC's collateral, it appeared that SPC would be able to evade "flunking" the "greater percentage" test. However, because of the parties' stipulations regarding the meaning and interpretation of the intercreditor agreement (to say nothing of BBL's proof of claim on file in this case), SPC *does* "flunk" the test with respect to its receipt of 45.47% of those monies. The source rule will shelter 54.53% of the transfers (representing the return to SPC of SPC's own collateral), but will not protect the balance, which represented proceeds of *BBL's* collateral. SPC's receipt of BBL's collateral enabled SPC to receive more than it otherwise would have received in a chapter 7 liquidation, where the selfsame proceeds would have been distributed not to SPC but to BBL, per the parties' stipulation. The Trustee has thus satisfactorily established the fifth element of his case in chief.

Because the Trustee has made out his case for avoidance of 45.47% of the payments the subject of this preference action, it devolves on the defendant, SPC, to successfully establish, by a preponderance of the evidence, at least one of the affirmative defenses available to creditors to resist a recovery by the Trustee. These defenses are set out in section 547(c), and it is to those defenses that we now turn.

## II. DEFENSES

 SPC has pled two defenses under section 547(c). One is that the payments were made in the ordinary course of business. 11 U.S.C. § 547(c)(2). The other is that SPC gave new value for any payments received. 11 U.S.C. § 547(c)(4). Not pled by SPC was the "revolving loan on inventory" defense set out in section 547(c)(5), which might conceivably apply to this case. We need not address that question, other than to note its absence, for the court should not address defenses not pled. Even if the defense had been pled, however, the evidentiary record is insufficient to support the defense, because we have not been furnished the requisite information about inventory levels at the beginning and end of the preference periods, relative to the outstanding loan balance at those two points in time. Without that factual information, the court could not make findings under section 547(c)(5) anyway. We thus turn our attention to the defenses actually pled by SPC.

### A. ORDINARY COURSE OF BUSINESS

 As one defense to the Trustee's preference claim, SPC urges that the payments made during the 90 days preceding the bankruptcy petition were made in "the ordinary course of business." 11 U.S.C. § 547(c)(2). Section 547(c)(2) states:

a trustee may not avoid ... a transfer to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2). SPC bears the burden of establishing each and every element of the defense. 11 U.S.C. § 547(g); *Union Bank v. Wolas,* 502 U.S. at 153–55, 112 S.Ct. at 529.

The *ordinary course* defense has three, distinct statutory elements. At one time, courts had considerable difficulty applying subparagraph (C) because of its apparent overlap with subparagraph (B). Most courts would simply ignore subparagraph (C), finding that so long as the preference payments

440

were made in the ordinary course of business affairs between the debtor and the transferee under subparagraph (B), the exception would be established without more. *See Fred Hawes Organization v. Basic Distribution Corp. (In re Fred Hawes),* 957 F.2d 239, 243 (6th Cir.1992). A minority view required each element to be separately proven by the party alleged to have received the preference, notwithstanding the apparent overlap. *Id.*

Now, little of this controversy remains. Most circuits have adopted the minority view. *WJM, Inc. v. Massachusetts Department of Public Welfare,* 840 F.2d 996 (1st Cir.1988); *Fiber Lite Corp. v. Molded Acoustical Products,* 18 F.3d 217 (3rd Cir.1994); *Fred Hawes Organization v. Basic Distribution Corp.,* 957 F.2d 239 (6th Cir.1992); *Matter of Tolona Pizza Products Corp.,* 3 F.3d 1029 (7th Cir.1993); *U.S.A. Inns of Eureka Springs, Arkansas, Inc. v. United Savings and Loan Association,* 9 F.3d 680 (8th Cir.1993); *Clark v. Balcor Real Estate Finance, Inc. (In re Meridith Hoffman Partners),* 12 F.3d 1549 (10th Cir.1993). The Seventh Circuit, in *Tolona Pizza,* explained that Subparagraph (B) contains a more subjective criteria, while subsection (C) furnishes a more objective test, giving content to both of these latter two elements of the defense. *Matter of Tolona Pizza Products Corp.,* 3 F.3d at 1033.[13]

In the present case, the parties do not dispute the satisfaction of the subparagraph (A) element. The parties agree that the debt in question was incurred in the ordinary course of business for both SPC and EPR. Therefore, the court can turn directly to the more controversial subparagraphs, (B) and (C).

1. WERE THE TRANSFERS MADE IN THE ORDINARY COURSE OF BUSINESS OR FINANCIAL AFFAIRS OF EPR AND SPC?

 Under subparagraph (B), the subjective prong, a court compares prior business dealings between the debtor and creditor with their dealings during the time of the preference period, to determine whether the debt/payment conduct during the preference period was ordinary when compared to other, presumably more regularized business dealings prior to the preference period. *Fred Hawes Organization v. Basic Distribution Corp. (In re Fred Hawes),* 957 F.2d 239, 244 (6th Cir.1992). The test is of necessity fact-specific. *Id.* Although not exhaustive, some of the factors which a court should examine include (1) the timing of the payments; (2) the amount of and manner in which a transaction was paid; and (3) the circumstances under which the transfer was made. *Id.* The implicit assumption in the test is that pre-preference period conduct will establish a sensible baseline against which to evaluate conduct during the preference period.

In the present case, however, it is difficult to find anything ordinary in the business dealings between EPR and SPC at any point in their relationship, in or out of the preference period. The parties' dealings from the beginning have been unbelievably dynamic. About the only thing close to "ordinary" were the terms of the underlying written agreement, which called for monthly billings for the previous month's invoices, to be paid on the 20th of the month following the invoice. These terms were generally followed until SPC came on the scene. Then the contract terms were almost never followed.

**13.** The court found that subsection (C) had two functions which in effect made it distinct from subsection (B). First, subsection (C) has an evidentiary function. The court said:

If the debtor and creditor dealt on terms that the creditor testifies were normal for them but that are wholly unknown in the industry, this casts some doubt on his testimony. Preferences are disfavored, and subsection (C) makes them harder to prove.

*Id.* 3 F.3d at 1032. Second, subsection (C) would protect other creditors by ensuring that one or more of the debtor's creditors did not work out a special deal before the preference

period which would allow them to get paid, but also protect against a preference being found if only subsection (B) were used.

The court also found the mere existence of subsection (C) as relevant to the inquiry. The court said:

The functions we have identified, combined with a natural reluctance to cut out and throw away one-third of an important provision of the Bankruptcy Code, persuade us that the creditor must show that the payment he received was made in accordance with the ordinary business terms in the industry.

*Id.*

Throughout the year leading up to the beginning of the preference period, EPR had trouble paying SPC on time, and SPC constantly altered the demands it placed on EPR. EPR was first required to pay weekly, then daily. Additional security was taken in the form of first one, then another letter of credit. At one point, SPC took control over the flow of crude oil by leasing tanks adjacent to the refinery. With this control over the flow of crude oil, on several occasions, SPC on a couple of occasions threatened to shut off the flow unless they received payment or additional security. By the end of the year, SPC was calling EPR on a daily basis to find out how much crude oil was needed, and deciding whether and how much to deliver only after evaluating EPR's old debt and SPC's current security position as of that day.

During the preference period, the relationship of the parties continued along much the same lines. EPR would make daily payments, and SPC would ship crude oil based upon its security and EPR's needs. Daily conversations were held between the parties. Threats of shutting down the supply continued, including one instance in which the flow was physically blocked by SPC. SPC continued to demand greater security for its shipments, and actually drew upon the $5 million letter of credit very early on during the preference period.

Nothing in the foregoing relationship, from July 1991, even vaguely resembles what one would call business conducted in accordance with "ordinary business terms." The only business terms were those dictated by SPC, and they were constantly changing on a monthly, weekly or even daily basis. The court is unable to find a realistic baseline for ordinary business relations between SPC and EPR, against which it could compare the dealings between SPC and EPR during the preference period. SPC has failed to meet its burden under subparagraph (B).

2. WERE THE TRANSFERS IN ACCORDANCE WITH ORDINARY BUSINESS TERMS?

 Even if SPC had met its burden under subsection (B) (and it did not), SPC would still have to prove that the dealings between SPC and EPR comported with "ordinary business terms" in an objective sense.

To establish that element, SPC was required to prove up the range of terms normally imposed in the business in which the debtor and the creditor are engaged (i.e., the "relevant industry"), and to show that the arrangements employed by SPC and EPR fell within that range. *See Matter of Tolona Pizza Products Corp.*, 3 F.3d 1029, 1033 (7th Cir.1993). The proper analysis is as the Seventh Circuit phrased it:

> "ordinary business terms" refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection (C).

*Id.* at 1034. The Third Circuit expressly adopted the *Tolona Pizza* test, though it substituted "unusual" for "idiosyncratic" in order to, in their opinion, be more faithful to the congressional intent expressed in the legislative history. *See Fiber Lite Corp. v. Molded Acoustical Products*, 18 F.3d 217, 224 (3d Cir.1994).

The parties stipulated to the terms of an "ordinary crude oil sales contract of SPC." These crude oil sales contracts are typically for substantially smaller volumes of crude oil deliveries per day and are either unsecured or secured only by a letter of credit. Sales contracts are almost never collateralized by liens on real property or other assets, are payable in lump sum payments on a monthly basis, and do not include gathering or handling fees. The contractual arrangement between SPC and EPR looked like anything but one of these "ordinary" contracts.

Mr. Roger Kragy, an employee of SPC, conceded that the terms of the relationship were not even normal for SPC, much less for the rest of the industry, and acknowledged that SPC treated no other account the way it did the EPR account. Mr. Mike Shelton, one of the senior officers of EPR, who has been in the refinery business for over 15 years and was familiar with crude oil sales contracts and the ordinary business terms employed in the industry, confirmed most of what Mr. Kragy had said, adding that the constant demands made by SPC for first weekly, then

daily payments, and always for additional security, were highly unusual.[14]

The stipulations and testimony confirm that the relationship between EPR and SPC fell well outside the range of ordinary business practices in the industry of crude oil supply to refineries. The impact of abrupt cutoffs in crude supply is so draconian that it was very easy to induce EPR to accede to things such as a daily payment scheme, SPC's complete control over flow, and increased security, as a prerequisite to a continuing supply. This sort of control and pressure made the EPR/SPC relationship highly unusual and idiosyncratic relative to the industry norm. Even SPC's own witness acknowledged that the relationship was "extraordinary." Thus, SPC has failed to meet its burden under the subsection (C) objective test.[15]

### B. NEW VALUE

▮▮▮▮ A second defense urged by SPC is the new value exception found at 11 U.S.C. § 547(c)(4). Under this exception a trustee may not avoid a preferential transfer:

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

11 U.S.C. § 547(c)(4). This defense, sometimes called the "subsequent advance" exception, allows a creditor to claim a credit against preferential transfers for subsequent advances of "new value" made after a given transfer. The exception is meant to protect those creditors who continue to extend credit to the debtor, perhaps in implicit reliance on prior payments, for if there were no exception, the creditor would merely be increasing its bankruptcy loss. Also, the rule's protection encourages creditors to continue their credit arrangements with financially troubled debtors, thus possibly allowing those debtors to avoid bankruptcy altogether. *Laker v. Vallette (Matter of Toyota of Jefferson, Inc.)*, 14 F.3d 1088, 1091 (5th Cir.1994).

### 1. IN GENERAL: AUGMENTATION AND REPLENISHMENT

▮▮▮▮ A creditor seeking to find shelter within section 547(c)(4) must establish (1) that the creditor gave new value; (2) that the new value was given subsequent to the preferential transfer; (3) that the new value given was not "secured by an otherwise unavoidable security interest," and (4) that the debtor did not make "an otherwise unavoidable transfer to or for the benefit of such creditor" on account of the new value. *Mat-*

---

**14.** The picture painted was one of absolute control on the part of SPC. If SPC's demands were not met, they would cut off the flow of crude. All of the crude supplied to the refinery came from tanks leased to SPC and adjacent to the refinery, and this gave SPC total control over the flow of crude oil into the refinery. SPC maintained personnel at the valve which controlled the flow to monitor and protect its crude. At one point and time SPC even locked the tanks, to maintain complete control.

**15.** One argument raised by SPC at trial should be discussed briefly. SPC argued that all of the evidence produced showed that the relationship between SPC and EPR was "extraordinary" and not usual for the industry. From this position, SPC further argued that because of the especially extraordinary nature of the relationship, the usual industry should not apply. Indeed, SPC seemed to suggest that no actual baseline industry existed.

This argument while inventive would seem to turn subparagraph (C) on its head, if it were accepted by the court. It seems that SPC is arguing that because their relationship with EPR is so outside the ordinary course of business for oil crude suppliers (or any other type of supplier for that matter), they should be exempt from showing that they are within the ordinary course of business type relationships. The basic effect of their argument is "we can not meet the section 547(c)(2)(C) requirement, so, we should not have to meet it." The plain hard facts are that the type of relationship which SPC is arguing they had with EPR is the exact type of relationship that the subparagraph (C) was meant to protect against. Section 547(c)(2)(C) protects those types of relationships which do not vary from the ordinary business terms so greatly as to be called "unusual" or "idiosyncratic. *Matter of Tolona*, 3 F.3d at 1034, *Fiber Lite*, 18 F.3d at 224. Just because SPC calls its relationship extraordinary does not remove it from the grasp of subparagraph (C). To the contrary, this is exactly why the relationship does *not* meet the test for that element.

*ter of Toyota of Jefferson,* 14 F.3d at 1091. The Fifth Circuit has explained that, when a creditor is paid from the estate's assets, but then extends new value, diminution of the estate will only occur to the extent that the transfer exceeds the new value extended, because the extension of new value effectively returns each payment to the estate. *Toyota of Jefferson,* 14 F.3d at 1092. Thus, the estate remains the same or in some instances will even be augmented. The important inquiry, says the Fifth Circuit, ought to be whether the new value replenishes the estate. *Id.* (citing *Kroh Brothers Dev. Co. v. Continental Constr. Eng'rs, Inc. (In re Kroh Bros. Dev. Co.),* 930 F.2d 648, 652 (8th Cir. 1991)). If, however, a creditor giving new credit receives "an otherwise unavoidable transfer" on account of that new credit extension, or if the new value is "secured by an otherwise unavoidable security interest," then the debtor's estate has *not* been "replenished" or "augmented," and the proffered new value will not qualify to "offset" the preferential transfers received. *See Toyota of Jefferson,* 14 F.3d at 1092; *see also Successor Committee of Creditors Holding Unsecured Claims v. Bergen Brunswig Drug Co. (In re Ladera Heights Community Hospital, Inc.),* 152 B.R. 964 (Bankr.C.D.Cal. 1993).

In the present case, SPC urges that its daily shipments of crude immediately following payments from EPR qualify as extensions of new value within the meaning of section 547(c)(4) and *Toyota Jefferson.* There is not much dispute that extensions of credit such as those found here can be new value. The parties also agree both that new value counts only to the extent that it is given after the transfers in question and that new extensions of credit were in fact given after preferential transfers were made. To qualify for the new value exception, however, the credit extensions must fit within the limitations set out in subparagraphs (A) and (B) of that section.

2. NEW VALUE DEFENSE IS NOT AVAILABLE TO THE EXTENT THAT NEW VALUE IS SECURED BY AN OTHERWISE UNAVOIDABLE SECURITY INTEREST

 Subparagraph (A) of section 547(c)(4) provides that new value, to qualify, must not be "secured by an otherwise unavoidable security interest." Not much has been written on this provision, and what little has been written is largely superficial. Courts have repeated the general policy observation that qualified new value must be given on "an unsecured basis," so that the estate will effectively not be harmed by the preference. *See Perlstein v. Rockwood Insurance Co. (In re AOV Industries, Inc.),* 85 B.R. 183 (Bankr.D.C.1988); *Chaitman v. Paisano Automotive Liquids (In re Almarc),* 62 B.R. 684 (Bankr.N.D.Ill.1986). If the new value is secured, however, and that very security interest is itself not avoidable, then the new value will not count for purposes of the defense. *Toyota of Jefferson,* 14 F.3d at 1092.

 The statute does not distinguish between creditors who are fully secured and creditors who are only partially secured. It simply disqualifies any new value that is secured. Thus, it appears from a plain reading of the statute that even creditors, such as SPC, who are undersecured, will find the new value they extend disqualified if the new credit is secured, pursuant to the terms of the lender's security instruments. Two courts have held that an undersecured creditor may still be able to claim the benefits of the new value defense. The holding of these cases is not inconsistent with the plain meaning of the statute. The key to their analysis is their focus on whether the *new value* was secured, not whether the *creditor* was "fully secured." *See Matter of Prescott,* 805 F.2d 719, 731 (7th Cir.1986) (what is important is that the new value be unsecured, not that the creditor in general be unsecured); *Wolinsky v. Central Vermont Teachers Credit Union,* 98 B.R. 669 (Bankr.D.Vt.1989) (the "new value" extended must be unsecured, not that the creditor in general be unsecured). Both the *Prescott* and the *Wolinsky* courts would, in this court's view, concur with the plain meaning interpretation of the statute announced here which draws no special distinction for undersecured creditors, and betrays no par-

ticular ambiguity on its face.[16] *See U.S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (plain meaning is the preferred method of statutory construction for the Bankruptcy Code).

Holding that the new value defense is unavailable if the new value is secured, without regard to whether the secured creditor is itself undersecured, comports with commercial reality. In the usual situation involving a creditor with a blanket security interest on after-acquired property, who receives payment and makes new deliveries, a preference will not even take place because all of the transfers received by such a creditor will usually be proceeds from the sale of the very collateral (usually inventory) that secures the debt. As we have already seen, a creditor who merely recovers the proceeds of its collateral receives no preference because the transfer will never violate the Greater Percentage Rule. *See* 11 U.S.C. § 547(b)(5); *see also* discussion *supra.* Such an undersecured creditor will almost never need to resort to the defense in the first place.[17]

Suppose an undersecured creditor were to receive cash payments from a debtor that were *not* attributable to its collateral proceeds. Suppose the creditor insisted on such payments as a way to build up its collateral position, to reduce its exposure as an undersecured creditor. Then the transfers *would* be preferential, requiring the creditor to resort to the new value defense. But the defense would not be available to shelter its receipt of these transfers, because, in our scenario, new shipments would be secured by the creditor's existing security interest, usually via an after-acquired property clause.

 And that is the right result. The new value defense is premised on the notion that the estate has suffered no harm from having made a preferential transfer (which presumptively diminishes the estate) if such transfers are offset by new value which has the effect of *augmenting* the estate. In our hypothetical, the estate will have been doubly diminished, first by the transfers, and then by the encumbrances of newly acquired inventory or other collateral, but only singly augmented by the extension of credit. The focus of the new value defense is not on whether the *creditor* extended what amounted to unsecured credit from the *creditor's* point of view (the position urged by SPC in this litigation), but rather on whether, from the point of view of the *estate,* the estate was replenished or augmented by the new value extended by the creditor. The estate is never augmented by new value that is secured.[18]

---

**16.** If *Prescott* and *Wolinsky* in fact announce a different rule, then that rule must be rejected as inconsistent with the plain meaning of the statute. Only when a plain facial reading of the statute reveals ambiguities (either internally or in the larger context of the overall statutory scheme), or when the plain meaning of the language of the statute would lead to absurd results which could not have been intended by Congress, are we then free to depart from the plain meaning to look elsewhere for assistance in divining the statute's true meaning. *Sheridan v. United States,* 487 U.S. 392, 403, 108 S.Ct. 2449, 2456, 101 L.Ed.2d 352 (1988). A creditor making new advances of the sort we find here does so in the context of a security agreement not unlike the one found here—one containing a future advance clause rendering all such advances *automatically* secured. Absent affirmative proof that the creditor *intended* its credit to be unsecured, the usual (and justified) assumption is that the future advance clause rendered the advances secured. Should the creditor subsequently benefit by a windfall appreciation in its collateral value (e.g., the price of oil suddenly rockets to $60 per barrel with a new oil embargo), then we would not be surprised to find the creditor insisting that all of its indebtedness is secured—including the indebtedness arising from these advances. Any other rule would require us to value the creditor's collateral position at the point of each extension of new value to test whether the creditor were undersecured, a decidedly unwieldy and impractical burden that this court doubts was what Congress had in mind when it wrote this particular provision. The plain meaning interpretation adopted by this court both comports with the reality of secured financing documents and avoids this sort of unwieldy litigation. No ambiguities or absurdities are suggested that require a departure from plain meaning.

**17.** If it *does* need a defense, the one such a creditor will normally reach for is that found in section 547(b)(5), which looks to see whether the creditor has improved its position at the conclusion of the ninety day period relative to the beginning of that period. *See* 11 U.S.C. § 547(c)(5).

**18.** Another example demonstrates why this is true. Suppose a creditor is owed $100,000 and has collateral valued at $50,000. Suppose as well that the debt is past due, so that there are current arrears of $25,000 (the creditor has not

Creditors who lend on a secured basis and who get paid out of the proceeds of their collateral do not need the new value defense. Creditors who attempt to improve their position at the expense of unsecured creditors do not deserve the defense.

Our straightforward reading of section 547(c)(4)(A) generates no anomalous results, no ambiguities, no absurdities that would compel any departure from the plain meaning of the statute as the rule of decision in this case. *Sheridan v. United States*, 487 U.S. 392, 403, 108 S.Ct. 2449, 2456, 101 L.Ed.2d 352 (1988).

The new value given by SPC in this case was its sale of crude oil on credit. Each time crude oil was sold to EPR, SPC also extended credit, essentially equivalent to the value of the crude oil shipment. SPC's loan documents included both an after-acquired property clause and a future advances clause, so that SPC's security interest automatically attached to all inventory acquired by EPR, including, of course, any crude oil sold by SPC to EPR during this preference period, while the advances themselves were automatically secured by the security agreement. SPC literally could not extend unsecured credit, unless it affirmatively waived its future advances and after-acquired clauses (and there is no evidence to indicate that it ever did).[19]

The present case, however, has been complicated by the intercreditor agreement and by the parties' stipulations as to its effect for purposes of this case. Recall that the parties

have stipulated that the intercreditor agreement is to be interpreted to give *both* SPC and BBL *a perfected security interest* in the crude oil which was shipped to EPR on a daily basis. Recall also that the parties have stipulated that, under the intercreditor agreement, the parties shared the collateral in specific proportions, SPC's security interest attaching to 54.53% of the collateral and BBL's security interest attaching to the remaining 45.47%. Already this stipulation has had one consequence, rendering 45.47% of the transfers from EPR to SPC preferential. Now the stipulation has another, opposite and counterbalancing effect. By virtue of the stipulation, SPC did *not* have a security interest in *all* the crude oil which was shipped to EPR on a daily basis. SPC's after-acquired property clause only attached, by stipulation of the parties to this litigation, to 54.53% of the collateral. The balance was not encumbered by SPC's security interest— though it was encumbered by BBL's "stipulated" security interest.

This changes our analysis dramatically. While all of the crude oil is collateral securing loans made or credit given under security interests held by either BBL or SPC, not all of the crude oil is collateral securing the credit extended by SPC, under *its* own security interest. This is not unlike the situation in which a supplier of inventory ships on an unsecured basis, with the inventory being financed by a working capital lender. The proceeds of the working capital lender's loan are expected to be used to buy inventory,

---

yet accelerated the note). Now suppose that, within the preference period, the debtor makes a payment of $5,000 to the creditor, and that the creditor ships $5,000 worth of goods to the debtor. The goods, by the terms of the security interest, become the collateral of the creditor upon the debtor's receipt (i.e., attachment takes place). Does the creditor get to shelter the preferential payment with the shipment of the goods? Of course not, because the estate has not been augmented. The $5,000 payment reduced the indebtedness to $95,000, but the shipment increased the indebtedness back to $100,000. Meanwhile, the collateral value available to the creditor increased by $5,000 (recall that, in this hypothetical, all proceeds are being retained, perhaps in a lockbox, and the payment made to the creditor comes from elsewhere—which is why it is preferential). The estate (at least *vis-a-vis* unsecured creditors) has not been augment-

ed. The additional $5,000 in new value is encumbered by a security interest, such that it will not be available to unsecured creditors.

Of course the creditor's deficiency claim has been reduced too, but that is not augmentation in the bankruptcy sense. After all, paydown of any unsecured debt occurs in *all* preferential transfers, yet we do not treat the paydown as itself also "new value" available as a defense. If we did, then, *ipso facto*, all recipients would have a new value defense, and the statute would be rendered a nullity.

**19.** Here, it is worthwhile to recall that the burden of proof on each and every element of the new value defense devolved on SPC. Absent affirmative evidence of waiver, the court must give effect to the loan documents, which operate automatically.

which turns on a regular (even constant) basis. The actual purchase may be from a vendor on unsecured terms (net thirty days plus ten, for example). Suppose the vendor decides not to ship any more unless the debtor agrees to start paying down old debt. The debtor complies, and the vendor then ships, again on an unsecured basis. Unfortunately, as soon as the shipment hits the debtor's doorstep, the working capital lender's lien attaches to the shipment (which has now become inventory). In much the same way, SPC, the vendor, shipped 45.47% of the crude oil feedstock to EPR on an unsecured basis, though the goods once shipped immediately became subject to another creditor's security interest, i.e., BBL's.

In our hypothetical, the new value extended by the vendor is goods sold on unsecured credit. The vendor ships goods but does not require the debtor to pay for those goods immediately upon delivery. Because the goods are sold on *credit* which is also *unsecured,* the vendor obtains no special rights as to the goods. The goods may become collateral, but the credit extended by the vendor is not thereby "secured credit" and so does not run afoul of section 547(c)(4)(A). The estate is augmented by the new value because the estate receives valuable and necessary goods, but is not required to expend estate assets to receive those goods. True enough, the working capital lender's inventory is also increased, but that is a different issue (in fact, that increase could result in a preference in

favor of the *lender,* requiring that lender to look to section 547(c)(5) for a defense).[20] But the estate is still augmented by the sale of goods on unsecured credit *by the vendor.*

Like the vendor in the above example, SPC extended credit on an unsecured basis, at least with respect to 45.47% of the feedstock delivered to EPR. EPR received feedstock and an extension of unsecured credit from SPC, and the estate was augmented by that amount. True enough, that selfsame 45.47% of feedstock delivered *did* serve to collateralize *BBL's* loans (per the stipulations), but BBL is like the working capital lender in our hypothetical. The Trustee might well have [21] a preference claim against BBL by virtue of the SPC/EPR transactions, but, as in our hypothetical, that does not deprive SPC of the benefit of its new value defense *vis-a-vis* SPC. SPC thus far appears to have a "new value" defense equivalent to 45.47% of the new credit extended.

This does not end our analysis, however. We must still determine whether any of this new value is disqualified by virtue of the limitations set out in subsection (B) of section 547(c)(4).

3. NEW VALUE DEFENSE IS NOT AVAILABLE TO THE EXTENT THAT THE NEW VALUE WAS GIVEN ON ACCOUNT OF AN OTHERWISE UNAVOIDABLE TRANSFER TO OR FOR THE BENEFIT OF SPC

To qualify for the new value exception, it is not enough that the creditor gave new value

---

**20.** This is another important point to emphasize in terms of commercial expectations. In terms of absolute impact on the estate's assets available for distribution to unsecured creditors in a chapter 7 liquidation, two preferences have taken place. One preference is the transfer of payment to the vendor, while the other is the attachment of the security interest to the goods by virtue of the working capital lender's after-acquired property clause. The policy question is from whom ought the estate to be able to recover the preference, and who ought to be sheltered from such a recovery? The vendor has extended unsecured credit to the estate, in exchange for its receipt of a preferential transfer, and both *Toyota of Jefferson* and *Ladera Heights* tell us that such a creditor ought to be insulated from a preference recovery. The working capital lender whose collateral position has been gratuitously augmented by the vendor's extension of unsecured credit, on the other hand, remains vulnerable to a preference attack, except to the extent that the lender

can find shelter in the section 547(b)(5) defense. That defense counsels that such a lender will suffer no liability to the estate so long as its overall inventory position, measured at the beginning and at the end of the preference period, has not been improved. Again, the right commercial result is achieved, for one presumes that the inventory of a going concern (even one in financial straits) turns. So long as the inventory actively turns but the creditor's position is not enhanced, the working capital lender will have a valid defense. Only when the lender's inventory position is allowed to grow will it suffer liability for a preference. And that, of course, is the right economic, as well as legal, result.

**21.** More accurately, *have had.* The Trustee and BBL entered into a global settlement of all claims and disputes prior to the trial of this preference litigation.

which is "not secured by an otherwise unavoidable security," under subsection (A). The new value must also not be given "on account of ... an otherwise unavoidable transfer to or for the benefit of the creditor extending new value." 11 U.S.C. § 547(c)(4)(B).[22] In the present case, two irrevocable letters of credit were issued by BBL in favor of SPC. The first letter of credit was issued on November 12, 1991 in the amount of $5,000,000.00. The parties have stipulated that this letter of credit was issued to secure the payment of any amounts owed to SPC in excess of the $37,450,000.00 then past due, and that, as security for the issuance of the letter of credit, BBL was given a contractually prioritized first lien on assets of the Debtor. The second letter of credit was issued on March 11, 1992 in the amount of $6,000,000.00. Once again, the parties have stipulated that this letter of credit was issued to secure payment of any amounts owed to SPC, this time in excess of $42,420,000.00, and that, in return for the issuance of this letter of credit, BBL received a share of a security interest in the refinery assets held by other lenders.

The parties' stipulations explain the reason these letters of credit were issued in favor of SPC. They created what the parties referred to as an "LC Cushion," which was used by SPC as security for the amounts of crude oil delivered over and above the amount of their security interest, and limited its crude oil advances accordingly. If the indebtedness outstanding to SPC exceeded the $37,450,000.00 limit, then SPC would still ship crude, provided that its exposure did not exceed the $11 million letters of credit. Does this letter of credit arrangement disqualify SPC's new value under the subsection (B) limitation?

 The plain language of subsection (B) requires simply that any new value given by a creditor must not be given 1) on account of; 2) an otherwise unavoidable transfer made by the debtor; 3) to or for the benefit of such

creditor. 11 U.S.C. § 547(c)(4)(B). If a creditor's transfer of new value runs afoul of these limitations, then the alleged new value transferred is not truly new value, and the creditor will not receive any credit on account thereof.

## (A) AN UNAVOIDABLE TRANSFER?

There can be little doubt that EPR made an otherwise unavoidable transfer in these letter of credit transactions. The offending "unavoidable transfer," for preference analysis, did not consist of the issuance of the letters of credit themselves, however. And it did not consist of BBL's honoring the letters of credit when they were called, either. Nor did it take place when SPC presented the letters of credit for payment. *See Matter of Compton Corp. (Kellogg v. Blue Quail Energy, Inc.)*, 831 F.2d 586, 589 (5th Cir.1987) (citing *In re W.L. Mead, Inc.*, 42 B.R. 57 (Bankr.N.D.Ohio 1984)). Rather, the offending transfer, for purposes of subsection (B) of section 547(c)(4), was EPR's pledge of property to *secure* the issuance of these letters of credit. *Id.* at 591. By giving BBL a new or increased lien, the Debtor directly transferred its property to BBL, for the indirect benefit of SPC. *Id.* It is that pledge of property to secure and induce the issuance of the letters of credit for the ultimate benefit of SPC (so that SPC would continue to ship crude to EPR) which counts as a disqualifying transfer within the meaning of the second element of subsection (B).

This transfer was obviously "otherwise unavoidable," for the letters of credit were issued by BBL on November 12, 1991 and March 11, 1991, well outside the preference period, and became secured at the point of their issuance. *Matter of Compton*, 831 F.2d at 591 (in a secured letter of credit transaction, the transfer of debtor's property takes place at the time the letter of credit is issued and received by the beneficiary, not at the time the issuer pays on the letter of credit). There is no evidence in the record to indicate

---

**22.** 11 U.S.C. § 547(c)(4)(B) provides:
(c) The trustee may not avoid under this section a transfer—
(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor

gave new value to or for the benefit of the debtor—
(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of the debtor.

that the security interests given to secure these letters of credit were anything other than fully perfected, and nothing in the record to indicate that they were in any way fraudulent. The transfers, then, are clearly "otherwise unavoidable," within the meaning of the statute.

### (B) To or For the Benefit of SPC?

Did EPR make these transfers (i.e., the pledge of collateral to secure the letters of credit) "to or for the benefit of [SPC]?" The case law gives virtually no guidance for interpreting this phrase as it is used in section 547(c)(4)(B), though two circuits have discussed the meaning of these same phrase as used in section 547(b)(1).[23] *See American Bank of Martin County v. Leasing Service Corporation (In re Air Conditioning, Inc. of Stuart)*, 845 F.2d 293 (11th Cir.1988); *Matter of Compton Corp. (Kellogg v. Blue Quail Energy, Inc.)*, 831 F.2d 586 (5th Cir.1987). *See also Security Services, Inc. v. National Union Fire Insurance Company of Pittsburgh, P.A. (In re Security Services, Inc.)*, 132 B.R. 411 (Bankr.W.D.Mo.1991). In both *Leasing Service* and *Compton*, the circuit courts held that a transfer of collateral to a bank in connection with the issuance of a letter of credit in favor of a third-party creditor counted as a transfer "to or for the benefit of" the third-party creditor, because of the *indirect* benefit conferred on that creditor even though the *direct* benefit of the collateral transfer inured, of course, to the bank that had issued the letter of credit. *Leasing Service*, 845 F.2d at 295–96; *Compton*, 831 F.2d at 591. The Fifth Circuit noted that the language of the statute should be read so as to reach the substance of the transaction, and that the pledge of collateral enabled the bank to issue a letter of credit which it otherwise would not have been willing to issue, to the economic benefit of the third-party creditor. The third-party creditor thus enjoyed the benefits of a pledge of collateral, even though the collateral was not pledged directly to that creditor. *Compton*, 831 F.2d at 591–92 (discussing *Palmer v. Radio Corporation of America*, 453 F.2d 1133 (5th Cir.1971)).

In the present case, SPC received just such an indirect benefit from the transfer of the security interest to BBL, a transfer which induced BBL to issue letters of credit in favor of SPC, assuring SPC that any advances of credit at least up to $11 million would be repaid with a certainty. The only difference between the benefit conferred on SPC and the benefits conferred on creditors in *Leasing Service* and *Compton* is that, in SPC's case, the indirect benefit applies to extensions of new credit, while in *Leasing Service* and *Compton* the benefit applied to *antecedent debt*. That difference mirrors the function of the statutory language. A transfer which confers an indirect benefit with respect to an antecedent debt may nonetheless be preferential. 11 U.S.C. § 547(b)(1). A transfer which confers an indirect benefit with respect to an extension of new value may similarly disqualify that new value. 11 U.S.C. § 547(c)(4)(B). We should give the same phrase the same meaning when it is used in a different subsection of the same statute. *Sorenson v. Secretary of Treasury*, 475 U.S. 851, 860, 106 S.Ct. 1600, 1606, 89 L.Ed.2d 855 (1986) (the normal rule of statutory construction assumes that "'identical words used in different parts of the same act are intended to have the same meaning.'"), citing *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87, 55 S.Ct. 50, 51, 79 L.Ed. 211 (1934), quoting *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433, 52 S.Ct. 607, 609, 76 L.Ed. 1204 (1932). *See also Dewsnup v. Timm*, 502 U.S. 410, 422–24, 112 S.Ct. 773, 781, 116 L.Ed.2d 903 (1992) (Scalia, J., dissenting).

We are not quite finished with our inquiry, however. The offending transfer will not actually be disqualifying unless it was made on account of the new value.

### (C) On Account of the New Value?

Finally, we must ask whether the potentially disqualifying transfers of collateral to BBL to secure the issuance of letters of credit in favor of SPC were made "on account of" the new value. If the letters of credit transactions, including the transfer of the new or increased liens in favor of BBL,

---

**23.** That subsection requires a trustee alleging a preferential transfer to show that the transfer was made "to or for the benefit of a creditor." 11 U.S.C. § 547(b)(1).

were not made on account of the new value transferred by SPC to the Debtor, then the transactions will have no disqualifying effect on SPC's new value defense.

Here we enter virgin territory. The court has found no authorities that directly address the proper interpretation of this particular aspect of subsection (B). By the same token, however, the court finds nothing particularly remarkable in the language of the statute that would require the court to depart from a plain meaning analysis. The phrase "on account of" carries with it the connotation of causation ("because of $x$, I will do $y$"). Here, the parties have stipulated that the letters of credit were provided *to secure payment* of crude oil shipments made in the future. The first letter of credit was issued in November 1991 when the Debtor was $37,-450,000.00 past due, and is stipulated as having been issued for the purpose of "securing payment of any amounts owed to SPC in excess of that amount. The second letter of credit, was issued when the Debtor became $5 million dollars past due over and above the $37,450,000.00 and, as stipulated by the parties, was also issued to secure payment of any amounts over $42,450,000.00. The stipulations further state that SPC would ship crude oil based upon the amount of "cushion" created by these letters of credit. Continuously before and all through the preference period, SPC would determine the amount available under the letters of credit before shipping any crude oil to EPR. If sufficient "credit" existed under these letters of credit to allow shipment, then SPC would ship crude oil, but the amount of that shipment was based upon how much of a "cushion" SPC enjoyed under the letters of credit.

Clearly, both letters of credit were issued for but one purpose—to induce SPC to keep selling crude oil to EPR. And just as clearly, the collateral pledged by EPR to BBL to induce the issuance of these letters of credit was made on account of the new value EPR expected SPC to extend. EPR effectively *prepaid* for the credit SPC extended with the secured letters of credit. EPR pledged col-

lateral for but one ultimate reason—to induce SPC to continue to extend credit to EPR. And that credit is precisely the new value which SPC here wants to claim as a defense. This it may not do, for that new value is disqualified by the limitation of subsection (B).

This outcome, in addition to being faithful to the straightforward statutory language, is also consistent with the overarching policy of "augmentation and replenishment" that guides the application of the new value defense in general. *See Toyota of Jefferson,* 14 F.3d at 1091. In the present case, any advances of crude oil on credit up to the $11 million backed by the letters of credit could not have replenished or augmented the estate. *See Prescott,* 805 F.2d at 728; *Meredith Manor,* 902 F.2d at 258–59; *Ladera Heights,* 152 B.R. at 967; *In re IRMF, Inc.,* 144 B.R. 886, 892–93 (Bankr.C.D.Cal.1992). All such "advances" were in reality *prepaid* by virtue of the letters of credit, for no one (including the trustee in bankruptcy) could prevent SPC from presenting those letters of credit for payment upon default, nor could anyone prevent BBL from honoring them upon presentment. *Compton,* 831 F.2d at 589–90; *see Kroh Brothers Development Company v. Continental Construction Engineers, Inc. (Matter of Kroh Brothers Development Company),* 930 F.2d 648 (8th Cir. 1991); *Lease–A–Fleet v. Morse Operations, Inc. (In re Lease–A–Fleet),* 141 B.R. 853 (Bankr.E.D.Pa.1992); *Erman v. Armco, Inc. (Matter of Formed Tubes, Inc.),* 46 B.R. 645 (Bankr.E.D.Mich.1985). Meanwhile, any such presentment would have the effect of depleting the bankruptcy estate. *See Kroh Brothers,* 930 F.2d at 653.[24]

It makes no practical difference that the transfer of property in question took place *before* the advances were made. True enough, from SPC's point of view, its advances were made on account of the letters of credit (and indirectly, on account of the pledge of property that made their issuance possible). But what is relevant for purposes of the statute is that, from EPR's point of

---

**24.** Indeed, the depletion in fact occurred when the letters of credit were issued. *Compton, supra; Kroh Brothers, supra.*

view, it pledged its property on account of the advances. But for SPC's insistence that letters of credit be issued in its favor as a direct precondition for its extending further credit, EPR certainly would not have further encumbered its assets to have the letters of credit issued. SPC was essentially insisting on prepayment as a precondition to further advances, and we can safely conclude, therefore, that it was "on account of" these advances that EPR pledged its property. The statute itself draws no distinction between *prepayment* and *repayment,* and neither should the court, for there is no functional difference between the two, either in terms of economic reality or in terms of the underlying policy of the statute (which is to reward only augmentation and replenishment).[25]

We need to recap, in order not to lose track. We have thus far determined that 45.47% of the payments made to SPC during the 90 days immediately preceding the bankruptcy filing were preferential under section 547(b). We have also determined that 45.47% of the crude oil sold by SPC on credit to EPR might qualify as "new value" under section 547(c)(4)(A). Now we have determined that the first $11 million of new value given during the preference period was given "on account of . . . an otherwise unavoidable transfer made by the debtor . . . to or for the benefit of such creditor," thus disqualifying that amount from consideration as "new value." The balance is still available to SPC for its new value defense. In the next section,

we will calculate the results of these legal conclusions.

III. CALCULATION

■ In order to calculate a net preference amount where a new value defense has been urged and proven, it is not enough to know the amount of the preferential payments and the amount of the new value. The two cannot simply be offset against one another. Unlike the old "net result" rule in force under sections 60(a) and (c) of the Bankruptcy Act, section 547(c)(4) requires that the new value be given subsequent to the preferential payment ("to the extent that, *after* such [preferential] transfer, such creditor gave new value to or for the benefit of the debtor"). 11 U.S.C. § 547(c)(4). This "subsequent advance" rule requires that "each preferential transfer is avoidable until exceeded by subsequent advances of new value. If the amount of the subsequent new value provided by the creditor exceeds a [given] preferential transfer, the defense is complete as to that transfer. Surplus new value, however, cannot be used to offset later preferential transfers." *In re Ladera Heights Community Hospital, Inc.,* 152 B.R. 964, 969–70 (Bankr.C.D.Cal.1993) (Fenning, B.J.); *accord Matter of Toyota of Jefferson,* 14 F.3d at 1092; *see also In re Meredith Manor, Inc.,* 902 F.2d 257, 259 (4th Cir.1990); *In re Jet Florida System, Inc.,* 841 F.2d 1082 (11th Cir.1988); *In re Prescott,* 805 F.2d 719, 728 (7th Cir.1986); *In re Fulghum Const. Corp.,* 706 F.2d 171 (6th Cir.1983).[26]

---

**25.** The court recognizes that the Fifth Circuit used the term "subsequently repaid" in its brief, one-sentence discussion of section 547(c)(4)(B). *See Matter of Toyota of Jefferson,* 14 F.3d at 1092. It would be a mistake to place too much weight on the circuit's choice of words, however, for the circuit was clearly not focused on the issue presented by the facts of our case. Indeed, the circuit court's approach to the facts presented in their case is consistent with the one we take here. The circuit court seems to have chosen the words it did primarily because the issue presented was whether *subsequent* preferential payments would disqualify all *prior* extensions of new value. The court quoted Professor Countryman's observation that subsequent payments which are themselves voidable as preferences are *qualified* precisely because they do *not* run afoul of the limitations of section 547(c)(4)(B). *Id.* The court then held that the final preferential payment in the case before them would not dis-

qualify previous advances of new value. *Id.,* at 1093. The *rationale* for the decision, however, was that the estate is still augmented. The court did not have before it the question presented by our facts—may *prepayments* count as payment "on account of" the new value in question? It is the essence of letters of credit transactions that the debtor *prepays* for credit. It seems to this court that the timing of the transfer should not alter the "on account of" relationship between the transfer of property by the debtor and the extension of new value by the creditor. Nothing in *Toyota of Jefferson,* including the offhand reference discussed here, suggests otherwise.

**26.** It should be noted that within our analysis of the "new value" defense we have followed the formula set out by the Fifth Circuit in *Toyota of Jefferson* and by Congress in the legislative history accompanying section 547(c)(4). *See* H.R.REP.

The attached chart sets out the results of the court's application of the subsequent advance rule to preferential payments and allowable new value defenses found in this decision. Column I represents the full amount of each payment made by EPR to SPC during the preference period and alleged to be a preference. Next to those amounts, in Column II, is an amount calculated to be 45.47% of the amount in Column I. The amounts in Column II are the amounts found by the court to be preferential (i.e., transfers made which, by virtue of the parties' stipulations regarding BBL's perfected security interest, are not proceeds of SPC's collateral). Column III represents the dollar value of crude oil shipped by SPC to EPR and claimed by SPC to be new value. The corresponding amounts in Column IV represent an amount calculated to be 45.47% of the amount in Column III, the amount which the court has found to qualify as potential new value because that portion is not secured by an otherwise unavoidable security interest in favor of SPC.

Finally, SPC cannot receive any credit for the first $11 million worth of new value because that amount was secured by the letters of credit, which were in turn secured by transfers which this court has found conferred an indirect benefit on SPC, such that transfers secured thereby disqualified the new value extended by virtue of section 547(c)(4)(B). Column V recalculates the amount of net new value actually available, based upon the amounts found in Column IV, but adjusted for the disqualifying $11 million letters of credit.[27] As it turns out, up until August 18, 1992, there is no qualified new value available because it is not until then, with a shipment of crude oil in the amount of $407,947.75, that the $11 million offset is finally exhausted. The new value credits only begin to kick in at that point against the preference balance. Prior to that point, the preference payments shown in Column II simply accumulate, unreduced by any credit (for no credit is available).[28] Thus, Column V shows negative numbers prior to August 18, 1992, as potential new value is subtracted from the $11 million in letters of credit then securing new advances by SPC to EPR. These negative numbers have no impact on the preference balance, but show the reader the impact of the letters of credit on the potential new value extensions. Beginning August 18, 1992, the numbers in Column V are positive, indicating actual net new value available as an offset in favor of SPC against the total preferential transfer balance.

Column VI carries the total preference balance forward, in a manner that most resembles a checking account balance. Each time a preference payment is made, this balance is increased correspondingly. Each new addition comes from Column II (the column which reflects what the court has determined to be preferential transfers pursuant to 11 U.S.C. § 547(b)). These prefer-

No. 95–595, 95th Cong., 1st Sess. 374, reprinted in U.S.CODE CONG. AND ADMIN.NEWS 5787, 6330 (1978). In *Toyota of Jefferson,* the Fifth Circuit also accepted the view that the "new value" extended need not remain totally unpaid. *Toyota of Jefferson,* 14 F.3d at 1093. While recognizing that other circuits have so held, the *Toyota of Jefferson,* court found that section 547(c)(4) only requires the new value not be repaid by "an otherwise unavoidable transfer." *Id.* (citing *In re Kroh Brothers Development Company,* 930 F.2d 648, 652 (1990), for the holding that the "new value" must go unpaid).

In effect a court's analysis under the "subsequent advance" rule of section 547(c)(4) is most closely analogous to the balancing of a checking account. Each time a preferential payment is made the account is credited and the balance is increased accordingly. New value which is given on behalf of the creditor results in a debit of the account and thereby decreases the preference balance. However, there is one caveat. The preference balance can never retain a negative balance, even though the creditor may give "new value" greater than the current amount of preference. This is of course because to give the creditor the benefit of a negative balance would in effect give the creditor an offset for new value given prior to the payment of the preference, in express derogation of the statute. *See* 11 U.S.C. § 547(c)(4).

**27.** The court has no reason to assume that the letters of credit are anything less than fully secured, especially in light of other orders that have been entered in this bankruptcy case which in effect presume just that.

**28.** Because, to reiterate, all of the new value up to that point is disqualified by the letters of credit, or more precisely, by the fact that the letters of credit were collateralized for the direct benefit of BBL, but the ultimate benefit of SPC.

ences simply accumulate and build in Column VI until August 18, 1992, for until that point, there are no qualifying new value credits available. On August 18, 1992, the total potential new value finally exceeds the $11 million in letters of credit, and a positive number shows up for the first time in Column V. Positive numbers in Column V operate to reduce the preference balance in Column VI.

Each new preference payment increases the preference balance. Each new net value reduces the preference balance. The preference balance carried forward thus reflects the previous preference balance plus any additional preference payments, and less any available credits for subsequent extensions of new value, in accordance with *Ladera Heights*.[29]

In this fashion, we achieve a final calculation which incorporates all the legal principles discussed in this opinion, applying them to the facts of the case. The net final number yielded by this process is $11,679,562.78.

### Conclusion

For the foregoing reasons, the court concludes that the Trustee's complaint to recover preferential transfer succeeds in part and fails in part. SPC received a preferential transfer equal to 45.47% of the total payments made by wire transfer ($82,000,000.00) from EPR to SPC in the 90 day period prior to the bankruptcy filing. However, the remaining 54.53% of the payments were proceeds of SPC's collateral and so are not recoverable as preferences.

As for the defenses which have been raised by SPC, SPC failed to meet its burden under section 547(c)(2). SPC failed to prove that the wire transfers were made in the ordinary course of business between SPC and EPR or that the transfers conformed to ordinary business terms. SPC did meet its burden at least in part under its section 547(c)(4) defense. SPC has shown that 45.47% of the new credit extended to EPR by SPC could qualify as new value not secured by an otherwise unavoidable security interest. However, the first $11 million worth of such credit was disqualified as having been given on account of an otherwise unavoidable transfer made by EPR to or for the benefit of SPC, to wit the security interest granted BBL to induce the issuance of the letters of credit to SPC.

The court has made calculations under the "subsequent advance" rule and determined that after all preferential payments are considered and due credit is given for qualified new value extended, SPC has received a preference in the amount of $11,679,562.78. Judgment shall be entered in favor of the Trustee in that sum.

---

**29.** If the new value ever exceeded the total amount of preference balance, the "account" would simply be reduced to zero. Following *Ladera Heights*, we would not "carry" the positive balance of new value forward. It would not "accumulate" as an available credit for subsequent new preferences. This never occurs here, however. Once qualifying new value begins to appear on August 18, 1992, it is immediately consumed by the total preference balance.

| Date Transferred | I Total Payment | II Pref. Payment (45.47% of Tot. Pay.) | III New Credit Provided | IV Gross New Value (45.47% of New Cred.) | V Net New Value* | VI Preference Balance |
|---|---|---|---|---|---|---|
| 7-24-92 | $3,000,000 | $1,364,100 | | | ($11,000,000.00) | $1,364,100.00 |
| 7-25-92 | | | $1,118,902 | $508,764.74 | ($10,491,235.26) | |
| 7-26-92 | | | $1,134,837 | $516,010.38 | ($9,975,224.88) | |
| 7-27-92 | | | $1,111,832 | $505,550.01 | ($9,469,674.87) | |
| 7-27-92 | $1,000,000 | $454,700 | | | | $1,818,800.00 |
| 7-28-92 | | | $1,117,363 | $508,074.05 | ($8,961,600.82) | |
| 7-28-92 | $1,000,000 | $454,700 | | | | $2,273,500.00 |
| 7-29-92 | | | $957,589 | $435,415.72 | ($8,526,185.10) | |
| 7-29-92 | $1,000,000 | $454,700 | | | | $2,728,200.00 |
| 7-30-92 | | | $1,003,110 | $456,114.12 | ($8,070,070.98) | |
| 7-30-92 | $1,500,000 | $662,050 | | | | $3,410,250.00 |
| 7-31-92 | | | $1,118,185 | $508,438.72 | ($7,561,632.26) | |
| 7-31-92 | $3,500,000 | $1,591,450 | | | | $5,001,700.00 |
| 8-01-92 | | | $1,120,670 | $509,568.65 | ($7,052,063.61) | |
| 8-02-92 | | | $1,119,460 | $509,018.46 | ($6,543,045.15) | |
| 8-03-92 | | | $1,101,078 | $500,660.17 | ($6,042,384.98) | |
| 8-03-92 | $500,000 | $227,350 | | | | $5,229,050.00 |
| 8-04-92 | | | $1,111,019 | $505,180.34 | ($5,537,204.64) | |
| 8-04-92 | $1,000,000 | $454,700 | | | | $5,683,750.00 |
| 8-05-92 | | | $1,057,084 | $480,656.09 | ($5,056,548.55) | |
| 8-05-92 | $1,000,000 | $454,700 | | | | $6,138,450.00 |
| 8-06-92 | | | $1,004,223 | $456,620.20 | ($4,599,928.35) | |

*Net of disqualified new value ($11 million)

| Date Transferred | I<br>Total Payment | II<br>Pref. Payment<br>(45.47% of Tot. Pay.) | III<br>New Credit Provided | IV<br>Gross New Value<br>(45.47% of New Cred.) | V<br>Net New Value* | VI<br>Preference Balance |
|---|---|---|---|---|---|---|
| 08/06/92 | $2,000,000.00 | $909,400.00 | | | | $7,047,850.00 |
| 08/07/92 | | | $960,662.00 | $436,813.01 | ($4,163,115.34) | |
| 08/07/92 | $2,000,000.00 | $909,400.00 | | | | $7,957,250.00 |
| 08/08/92 | | | $935,514.00 | $425,378.22 | ($3,737,737.12) | |
| 08/09/92 | | | $944,305.00 | $429,375.48 | ($3,306,361.64) | |
| 08/10/92 | | | $876,567.00 | $398,575.01 | ($2,909,766.63) | |
| 08/10/92 | $500,000.00 | $227,350.00 | | | | $8,184,600.00 |
| 08/11/92 | | | $955,811.00 | $434,607.26 | ($2,475,179.37) | |
| 08/11/92 | $1,500,000.00 | $682,050.00 | | | | $8,866,650.00 |
| 08/12/92 | | | $851,978.00 | $387,394.40 | ($2,087,784.97) | |
| 08/12/92 | $1,500,000.00 | $682,050.00 | | | | $9,548,700.00 |
| 08/13/92 | | | $771,402.00 | $350,756.49 | ($1,737,028.48) | |
| 08/13/92 | $1,500,000.00 | $682,050.00 | | | | $10,230,750.00 |
| 08/14/92 | | | $950,688.00 | $432,275.56 | ($1,304,752.92) | |
| 08/14/92 | $2,000,000.00 | $909,400.00 | | | | $11,140,150.00 |
| 08/15/92 | | | $907,487.00 | $412,634.34 | ($892,118.58) | |
| 08/16/92 | | | $905,364.00 | $411,669.01 | ($480,449.57) | |
| 08/17/92 | | | $909,034.00 | $413,397.76 | ($67,111.81) | |
| 08/17/92 | $1,000,000.00 | $454,700.00 | | | | $11,594,850.00 |
| 08/18/92 | | | $897,180.00 | $407,947.75 | $340,835.94 | $11,254,014.06 |
| 08/18/92 | $1,000,000.00 | $454,700.00 | | | | |
| 08/19/92 | | | $811,480.00 | $368,979.96 | $368,979.96 | $11,705,714.06 |
| 08/19/92 | $1,000,000.00 | $454,700.00 | | | | $11,339,734.10 |
| 08/19/92 | $1,000,000.00 | $454,700.00 | | | | $11,794,494.10 |

| Date Transferred | I Total Payment | II Pref. Payment (45.47% of Tot. Pay.) | III New Credit Provided | IV Gross New Value (45.47% of New Cred.) | V Net New Value* | VI Preference Balance |
|---|---|---|---|---|---|---|
| 08/20/92 | | | $814,984.00 | $370,573.22 | $370,573.22 | $11,423,860.88 |
| 08/21/92 | | | $660,850.00 | $391,428.50 | $391,428.50 | $11,092,492.38 |
| | | | | | | |
| 08/21/92 | $2,000,000.00 | $909,400.00 | | | | $11,941,832.38 |
| 08/22/92 | | | $791,692.00 | $359,982.35 | $359,982.35 | $11,581,850.03 |
| 08/23/92 | | | $964,669.00 | $438,634.99 | $438,634.99 | $11,149,215.04 |
| 08/24/92 | | | $879,016.00 | $399,688.58 | $399,688.58 | $10,743,526.46 |
| | | | | | | |
| 08/24/92 | $1,000,000.00 | $454,700.00 | | | | $11,198,226.46 |
| 08/25/92 | | | $1,015,705.00 | $461,841.06 | $461,841.06 | $10,736,385.40 |
| | | | | | | |
| 08/25/92 | $1,000,000.00 | $454,700.00 | | | | $11,191,085.40 |
| 08/26/92 | | | $497,984.00 | $199,142.23 | $199,142.23 | $10,991,949.17 |
| | | | | | | |
| 08/26/92 | $500,000.00 | $227,350.00 | | | | $11,219,299.17 |
| 08/27/92 | | | $386,806.00 | $175,880.69 | $175,880.69 | $11,043,412.48 |
| | | | | | | |
| 08/27/92 | $500,000.00 | $227,350.00 | | | | $11,270,762.48 |
| 08/28/92 | | | $429,673.00 | $195,463.25 | $195,463.25 | $11,075,299.23 |
| | | | | | | |
| 08/28/92 | $1,500,000.00 | $682,050.00 | | | | $11,757,349.23 |
| 08/29/92 | | | $488,171.00 | $221,971.35 | $221,971.35 | $11,535,377.88 |
| 08/30/92 | | | $385,080.00 | $175,095.88 | $175,095.88 | $11,360,282.00 |
| 08/31/92 | | | $519,196.00 | $236,078.42 | $236,078.42 | $11,124,203.58 |
| | | | | | | |
| 08/31/92 | $500,000.00 | $227,350.00 | | | | $11,351,553.58 |
| 09/01/92 | | | $391,208.00 | $177,862.28 | $177,862.28 | $11,173,671.30 |
| | | | | | | |
| 09/01/92 | $1,000,000.00 | $454,700.00 | | | | $11,626,371.30 |
| 09/02/92 | | | $910,322.00 | $413,923.41 | $413,923.41 | $11,214,447.89 |
| | | | | | | |
| 09/02/92 | $1,000,000.00 | $454,700.00 | | | | $11,669,147.69 |
| 09/03/92 | | | $1,150,944.00 | $523,334.24 | $523,334.24 | $11,145,813.65 |

| Date Transferred | I Total Payment | II Pref. Payment (45.47% of Tot. Pay.) | III New Credit Provided | IV Gross New Value (45.47% of New Cred.) | V Net New Value* | VI Preference Balance |
|---|---|---|---|---|---|---|
| 09/03/92 | $2,000,000.00 | $909,400.00 | | | | $12,055,213.65 |
| 09/04/92 | | | $1,184,115.00 | $538,417.09 | $538,417.09 | $11,516,796.56 |
| | | | | | | |
| 09/04/92 | $3,000,000.00 | $1,364,100.00 | | | | $12,880,896.56 |
| 09/05/92 | | | $1,172,967.00 | $533,348.09 | $533,348.09 | $12,347,548.47 |
| 09/06/92 | | | $1,178,350.00 | $535,795.75 | $535,795.75 | $11,811,752.72 |
| 09/07/92 | | | $1,212,789.00 | $551,451.07 | $551,451.07 | $11,260,301.65 |
| 09/08/92 | | | $1,275,253.00 | $579,857.54 | $579,857.54 | $10,680,444.11 |
| | | | | | | |
| 09/08/92 | $500,000.00 | $227,350.00 | | | | $10,907,794.11 |
| 09/09/92 | | | $1,131,401.00 | $514,448.03 | $514,448.03 | $10,393,346.05 |
| | | | | | | |
| 09/09/92 | $1,000,000.00 | $454,700.00 | | | | $10,848,046.08 |
| 09/10/92 | | | $1,162,091.00 | $528,402.78 | $528,402.78 | $10,319,643.30 |
| | | | | | | |
| 09/10/92 | $2,000,000.00 | $909,400.00 | | | | $11,229,043.30 |
| 09/11/92 | | | $1,207,671.00 | $549,128.00 | $549,128.00 | $10,679,915.30 |
| | | | | | | |
| 09/11/92 | $3,500,000.00 | $1,591,450.00 | | | | $12,271,365.30 |
| 09/12/92 | | | $1,117,286.00 | $508,029.94 | $508,029.94 | $11,763,335.36 |
| 09/13/92 | | | $1,104,740.00 | $502,325.28 | $502,325.28 | $11,261,010.08 |
| 09/14/92 | | | $1,129,023.00 | $513,366.76 | $513,366.76 | $10,747,643.32 |
| | | | | | | |
| 09/14/92 | $500,000.00 | $227,350.00 | | | | $10,974,993.32 |
| 09/15/92 | | | $996,310.00 | $453,022.16 | $453,022.16 | $10,521,971.16 |
| | | | | | | |
| 09/15/92 | $1,000,000.00 | $454,700.00 | | | | $10,976,671.16 |
| 09/16/92 | | | $941,590.00 | $428,140.97 | $428,140.97 | $10,548,530.19 |
| | | | | | | |
| 09/16/92 | $1,000,000.00 | $454,700.00 | | | | $11,003,230.19 |
| 09/17/92 | | | $856,524.00 | $389,461.46 | $389,461.46 | $10,613,768.73 |

| Date Transferred | I Total Payment | II Pref. Payment (45.47% of Tot. Pay.) | III New Credit Provided | IV Gross New Value (45.47% of New Cred.) | V Net New Value* | VI Preference Balance |
|---|---|---|---|---|---|---|
| 09/17/92 | $1,000,000.00 | $454,700.00 | | | | $11,066,468.73 |
| 09/18/92 | | | $891,813.00 | $405,507.37 | $405,507.37 | $10,662,961.36 |
| | | | | | | |
| 09/18/92 | $2,500,000.00 | $1,136,750.00 | | | | $11,799,711.36 |
| 09/19/92 | | | $889,045.00 | $404,248.76 | $404,248.76 | $11,395,462.60 |
| 09/20/92 | | | $910,718.00 | $414,103.47 | $414,103.47 | $10,981,359.13 |
| 09/21/92 | | | $875,801.00 | $398,135.77 | $398,135.77 | $10,583,223.36 |
| | | | | | | |
| 09/21/92 | $500,000.00 | $227,350.00 | | | | $10,810,573.36 |
| 09/22/92 | | | $785,851.00 | $357,326.45 | $357,326.45 | $10,453,246.91 |
| | | | | | | |
| 09/22/92 | $1,000,000.00 | $454,700.00 | | | | $10,907,946.91 |
| 09/23/92 | | | $852,514.00 | $387,638.12 | $387,638.12 | $10,520,308.79 |
| | | | | | | |
| 09/23/92 | $1,000,000.00 | $454,700.00 | | | | $10,975,008.79 |
| 09/24/92 | | | $700,936.00 | $318,715.60 | $318,715.60 | $10,656,293.19 |
| | | | | | | |
| 09/24/92 | $1,000,000.00 | $454,700.00 | | | | $11,110,993.19 |
| 09/25/92 | | | $747,841.00 | $340,043.30 | $340,043.30 | $10,770,949.89 |
| | | | | | | |
| 09/25/92 | $2,000,000.00 | $909,400.00 | | | | $11,680,349.89 |
| 09/26/92 | | | $795,062.00 | $361,514.69 | $361,514.69 | $11,318,835.20 |
| 09/27/92 | | | $873,268.00 | $397,074.96 | $397,074.96 | $10,921,760.24 |
| 09/28/92 | | | $868,014.00 | $403,779.97 | $403,779.97 | $10,517,980.27 |
| | | | | | | |
| 09/28/92 | $750,000.00 | $341,025.00 | | | | $10,859,005.27 |
| 09/29/92 | | | $912,040.00 | $414,704.59 | $414,704.59 | $10,444,300.68 |
| | | | | | | |
| 09/29/92 | $1,000,000.00 | $454,700.00 | | | | $10,899,000.68 |
| 09/30/92 | | | $992,977.00 | $451,506.64 | $451,506.64 | $10,447,494.04 |
| | | | | | | |
| 09/30/92 | $1,000,000.00 | $454,700.00 | | | | $10,902,194.04 |
| 10/01/92 | | | $960,092.01 | $435,553.83 | $435,553.83 | $10,465,640.21 |

| | I | II | III | IV | V | VI |
|---|---|---|---|---|---|---|
| Date Transferred | Total Payment | Pref. Payment (45.47% of Tot. Pay.) | New Credit Provided | Gross New Value (45.47% of New Cred.) | Net New Value* | Preference Balance |
| 10/01/92 | $1,500,000.00 | | | | | $11,147,690.21 |
| 10/02/92 | | $682,050.00 | | | | $10,685,564.96 |
| | | | $1,016,330.00 | $462,125.25 | $462,125.25 | |
| 10/02/92 | $2,250,000.00 | $1,023,075.00 | | | | $11,708,689.96 |
| 10/03/92 | | | $1,055,082.00 | $479,745.79 | $479,745.79 | $11,228,894.17 |
| 10/04/92 | | | $1,049,241.00 | $477,089.88 | $477,089.88 | $10,751,804.29 |
| 10/05/92 | | | $1,049,860.00 | $477,371.34 | $477,371.34 | $10,274,432.95 |
| | | | | | | |
| 10/05/92 | $1,000,000.00 | $454,700.00 | | | | $10,729,132.95 |
| 10/06/92 | | | $1,019,000.00 | $463,339.30 | $463,339.30 | $10,265,793.65 |
| | | | | | | |
| 10/06/92 | $1,000,000.00 | $454,700.00 | | | | $10,720,493.65 |
| 10/07/92 | | | $982,341.00 | $446,670.45 | $446,670.45 | $10,273,823.20 |
| | | | | | | |
| 10/07/92 | $1,500,000.00 | $682,050.00 | | | | $10,955,873.20 |
| 10/08/92 | | | $1,015,491.00 | $461,743.76 | $461,743.76 | $10,494,129.44 |
| | | | | | | |
| 10/08/92 | $2,000,000.00 | $909,400.00 | | | | $11,403,529.44 |
| 10/09/92 | | | $1,065,463.00 | $484,466.03 | $484,466.03 | $10,919,063.41 |
| | | | | | | |
| 10/09/92 | $2,500,000.00 | $1,136,750.00 | | | | $12,055,813.41 |
| 10/10/92 | | | $1,049,725.00 | $477,310.41 | $477,310.41 | $11,578,503.00 |
| 10/11/92 | | | $1,043,403.00 | $474,435.34 | $474,435.34 | $11,104,067.66 |
| 10/12/92 | | | $1,018,074.00 | $462,918.25 | $462,918.25 | $10,641,149.41 |
| 10/13/92 | | | $1,008,406.00 | $456,522.21 | $458,522.21 | $10,182,627.20 |
| | | | | | | |
| 10/13/92 | $1,500,000.00 | $682,050.00 | | | | $10,864,677.20 |
| 10/14/92 | | | $1,029,782.00 | $468,241.88 | $468,241.88 | $10,396,435.32 |
| | | | | | | |
| 10/14/92 | $1,000,000.00 | $454,700.00 | | | | $10,851,135.32 |
| 10/15/92 | | | $1,015,042.00 | $461,539.60 | $461,539.60 | $10,389,595.72 |

| Date Transferred | I Total Payment | II Pref. Payment (45.47% of Tot. Pay.) | III New Credit Provided | IV Gross New Value (45.47% of New Cred.) | V Net New Value* | VI Preference Balance |
|---|---|---|---|---|---|---|
| 10/15/92 | $2,000,000.00 | $909,400.00 | | | | $11,298,995.72 |
| 10/16/92 | | | $1,012,859.00 | $460,546.99 | $460,546.99 | $10,838,449.73 |
| | | | | | | |
| 10/16/92 | $3,000,000.00 | $1,364,100.00 | | | | $12,202,548.73 |
| 10/17/92 | | | $1,081,359.00 | $491,693.94 | $491,693.94 | $11,710,854.79 |
| 10/18/92 | | | $1,091,682.00 | $496,387.81 | $496,387.81 | $11,214,466.98 |
| 10/19/92 | | | $773,514.00 | $351,716.82 | $351,718.82 | $10,862,750.16 |
| 10/20/92 | | | $365,714.00 | $166,290.16 | $166,290.16 | $10,696,460.00 |
| | | | | | | |
| | | | | | Total | $10,696,460.00 |