IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-51067

_____


In The Matter of: EL PASO REFINERY, L P
                              Debtor

ANDREW B KRAFSUR, Trustee for El Paso Refinery, L P
                              Appellee - Cross-Appellant

                    versus

SCURLOCK PERMIAN CORPORATION
                              Appellant - Cross-Appellee

******************************************************************

No. 98-50043

In the Matter Of: EL PASO REFINERY, L P
                              Debtor

SCURLOCK PERMIAN CORPORATION
                              Appellant - Cross-Appellee

                    versus

ANDREW B KRAFSUR, Trustee for El Paso Refinery, L P
                              Appellee - Cross-Appellant


_____

Appeals from the United States District Court
for the Western District of Texas

_____

March 26, 1999

Before HIGGINBOTHAM, DUHÉ, and DeMOSS, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

This is an appeal of a bankruptcy case, affirmed by the district court, in which the Trustee, Andrew Krafsur, was permitted to avoid payments by the debtor, El Paso Refinery, to one of its creditors, Scurlock Permian Corporation, on the basis of preferential transfers. We find no such transfers and REVERSE.

I

El Paso operated a refinery to which Scurlock supplied crude oil on credit under a written supply agreement established by Scurlock's predecessor, the Permian Operating Partnership. On October 23, 1992, El Paso filed for bankruptcy protection under Chapter 11, later converted to Chapter 7. The Trustee sought to avoid $82,000,000 in payments made by El Paso to Scurlock during the preference period.

El Paso's obligation to Scurlock was secured by a first lien on collateral such as accounts receivable, inventory, contract rights, and proceeds. El Paso was also financed by Bank Brussels Lambert, with whom Scurlock had an Intercredit Agreement. The Intercredit Agreement between Scurlock and BBL provided that, in the event of a default, Scurlock and BBL shared Scurlock's first lien and that BBL's lien was of "equal dignity" subject to a pro rata allocation in accordance with the outstanding principal amount of BBL's debt and Scurlock's debt. The parties stipulated, for the purposes of the adversary proceeding only, that they shared the collateral in the following proportion: 54.53% to Scurlock and 45.47% to BBL.

2

Before July 1, 1991, El Paso had usually paid Permian promptly. Most of the money used to pay Permian, however, was borrowed from BBL, and by July 1991, BBL had advanced over $25,000,000 to El Paso. After Scurlock succeeded Permian, El Paso fell behind in its payments. By the end of September 1991, El Paso was "past due" to Scurlock by $37,450,000 and owed BBL approximately $37,000,000. At Scurlock's request, in September 1991, El Paso began to pay weekly, sometimes daily, instead of monthly.

On November 12, 1991, presumably at Scurlock's insistence, El Paso asked BBL to issue an irrevocable letter of credit in favor of Scurlock, in the amount of $5,000,000, to secure repayment of any advances by Scurlock in excess of the $37,450,000 already past due, plus interest, for further continued shipments of crude oil. El Paso gave BBL a priming lien, which by agreement was given a priority over the preexisting first lien of a group of Term Lenders, on the refinery's hard assets to secure this letter of credit. Scurlock continued to provide approximately $1 million of crude daily on an "as needed"[1] basis as long as the total amount El Paso owed Scurlock did not exceed $42,420,000 ($37,450,000 plus $5 million credit line).[2]

---

[1]Scurlock leased crude oil storage tanks adjacent to El Paso and fully controlled the flow of crude oil.

[2]The unused portion of the credit line was termed the "L/C Cushion."

El Paso's business did not improve and by March 1992, it had exhausted the $5 million credit line. On March 11, 1992, again at Scurlock's insistence, El Paso arranged for a second letter of credit from BBL in favor of Scurlock for $6 million. Like the $5 million credit letter, this letter was designed to continue to secure sales of crude by Scurlock to El Paso. Similarly, as long as the sales of crude did not cause El Paso's total indebtedness to Scurlock to exceed the $42,420,000 plus the new $6 million line of credit, Scurlock would continue to ship crude to El Paso. Scurlock, BBL, and other lenders participated in the loan for the $6 million letter of credit, which was secured by another lien on the refinery's hard assets.

On October 16, 1992, Scurlock notified El Paso of a default and invoked its contractual right to stop the supply of crude oil. El Paso filed for Chapter 11 on October 23, 1992; the case was converted to Chapter 7 in November 1993. El Paso's Trustee filed this preference lawsuit to avoid and recover payments made to Scurlock during the 90 days preceding the bankruptcy filing (July 24, 1992 - October 23, 1992).

After deciding that the Intercredit Agreement operated as a partial assignment and not a subordination agreement, the bankruptcy court ruled that 54.53% of the payments from El Paso to Scurlock in the 90 day period preceding the bankruptcy filing were proceeds from Scurlock's own collateral and therefore not recoverable as preferences. The remaining 45.47% of the

4

transferred payments, however, were deemed preferential because, according to the bankruptcy court's interpretation of the Intercredit Agreement, that portion had been assigned to BBL. The bankruptcy court held that Scurlock received a preferential transfer equal to 45.47% of the total payments ($37,285,400 of a total $82 million), but concluded that some of it qualified as new value. After applying the new value exception, the bankruptcy court calculated that Scurlock received a preference in the amount of $10,696,460. It rejected Scurlock's "ordinary course of the business" defense. The district court affirmed and both parties appealed. We have jurisdiction pursuant to 28 U.S.C. § 158(d).

                                II

     We apply the same standards of review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court. See Kennard v. MBank Waco, N.A. (In re Kennard), 970 F.2d 1455 (5th Cir. 1992). A bankruptcy court's findings of fact are reviewed under the clearly erroneous standard, and its conclusions of law are reviewed de novo. See Traina v. Whitney Nat'l Bank, 109 F.3d 244, 246 (5th Cir. 1997).

                                III

     Our ultimate issue is whether any of the payments from El Paso to Scurlock during the 90 days preceding the bankruptcy filing were preferential. Scurlock argues that none of the payments made to it during the 90 day period preceding the bankruptcy filing were preferential transfers. In the alternative, Scurlock claims that

5

if the payments were preferential, the maximum recoverable preference not subject to its new value defense would be $751,703. The Trustee argues that all payments, approximately $82,000,000, were preferential and recoverable.

The elements of a preference are set out in § 547(b), providing:

> [T]he trustee may avoid any transfer of an interest of the debtor in property--
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made--
>
>> (A) on or within 90 days before the date of filing of the petition;  or
>>
>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if--
>
>> (A) the case were a case under chapter 7 of this title;
>>
>> (B) the transfer had not been made; and
>>
>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Once the trustee meets this burden, the defendant must establish one of the exceptions contained in § 547(c) to prove the nonavoidability of a transfer.  See 11 U.S.C. § 547(g).

In this case, the parties stipulated to the first four of the five elements of § 547(b). The Trustee had to establish the fifth element – as a result of the transfer, the creditor received a greater percentage recovery on its debt than it would otherwise have received had it looked solely to distribution from the Chapter 7 estate for its payment. See 11 U.S.C. § 547(b)(5); Palmer Clay Prods. Co. v. Brown, 297 U.S. 227 (1936).

The greater percentage test is most easily understood in the context of an unsecured creditor that receives prepetition payments. In that case, if the unsecured creditor received more than he would have if the payments had been retained by the estate and then distributed to all the unsecured creditors after paying the secured creditors in a bankruptcy proceeding, the unsecured creditor impermissibly received a greater percentage by preference. In contrast, a fully secured creditor who receives a prepetition payment does not receive a greater percentage than he would have in a bankruptcy proceeding because as a fully secured creditor he would have recovered 100% payment in a bankruptcy proceeding. Accordingly, a creditor who recovers his own collateral is not deemed to have recovered a greater percentage than he would have in bankruptcy. Similarly, an undersecured creditor who receives prepetition payments does not receive a greater percentage recovery when the source of the payments is the creditor's own collateral.

To determine whether an undersecured creditor received a greater percentage recovery on its debt than it would have under

7

chapter 7 the following two issues must first be resolved: (1) to what claim the payment is applied and (2) from what source the payment comes. See id. at 434. Both aspects must be examined before the issue of greater percentage recovery can be decided.

(1) The Application Aspect

If a payment to an undersecured creditor, like Scurlock, is applied to the unsecured portion of the debt, then the undersecured creditor will have recovered a greater percentage on this claim if the estate cannot pay its unsecured creditors 100% of these claims. See id. (citing Flynn v. Midamerican Bank & Trust Co. (In re Joe Flynn Rare Coins, Inc.), 81 B.R. 1009, 1018 (Bankr.D.Kan. 1988)); In re Fitzgerald, 49 B.R. 62, 65 (Bankr.D.Mass. 1985); 4 L. KING, COLLIER ON BANKRUPTCY, ¶ 547.09, at 547-43 (15th ed. 1990). In contrast, if the undersecured creditor applies the payment to the secured portion of the debt, the creditor effectively releases a portion of its collateral from its security interest, that is, its secured claim is reduced, freeing up a corresponding amount of collateral. In this situation, the creditor does not receive a greater percentage recovery. If, however, the creditor does not actually release collateral upon application of the payment, then the payment is ipso facto a payment on the unsecured portion of the claim. See id. at 435-36.

The bankruptcy court found no evidence in the record that Scurlock ever released collateral when it received payments from El Paso. Scurlock's security instruments were designed to capture

8

"any and all indebtedness," meaning that, so long as there was indebtedness in excess of collateral, all the collateral remained encumbered.  See id.

Scurlock argues that the bankruptcy court and district court erred because they ignored the fact that El Paso's antecedent debt was covered by letters of credit that were in turn collateralized by El Paso's assets.  If El Paso failed to pay Scurlock during the 90 days and Scurlock drew on the letters of credit issued by BBL, BBL would have had a claim against El Paso's collateralized assets.  According to Scurlock, each time a payment was made, it prevented a corresponding claim from being asserted by BBL against El Paso's assets.  Therefore, Scurlock maintains the payments were not preferential because they were indirectly applied to the secured portion of Scurlock's undersecured debt.

The district court found the bankruptcy court's determination that Scurlock was undersecured and never released any collateral a finding of fact that was not clearly erroneous.  Despite Scurlock's argument otherwise, it seems untenable to claim to have released collateral with each payment when the entire collateral base remained secured throughout the payments.  We therefore find no error in the ruling below on the application aspect of the greater percentage recovery test.

(2) The "Source" Aspect

Even if the payment in question was applied to the unsecured portion of an undersecured creditor's claim, the creditor will not

be deemed to have received a greater percentage as a result of the payment if the source of the payment is the creditor's own collateral. A creditor who merely recovers its own collateral receives no more as a result than it would have received anyway had the funds been retained by the debtor, subject to the creditor's security interest. See In re El Paso Refinery, 178 B.R. at 435-36 (citing 4 L. KING, COLLIER ON BANKRUPTCY, ¶ 547.09, at 547-43 (15th ed. 1990)).

Scurlock offered uncontroverted expert testimony to establish that all of the funds used to make the allegedly preferential payments were proceeds of a security interest in current assets (inventory, accounts receivable, contract rights, and proceeds). The bankruptcy court held that the evidence established that the source of all the alleged preferential payments were "proceeds" of collateral in which Scurlock held a security interest. See id. at 436.

Scurlock maintains that once the bankruptcy court determined that the source of the preferential payments was Scurlock's collateral, the inquiry should have ended with no preferential payments established. The bankruptcy court, however, rejected this argument because of its interpretation of the Intercredit Agreement and the parties' stipulations regarding Scurlock's collateral. We now arrive at the determinative issue of this appeal: the bankruptcy and district courts' treatment of the parties' stipulations and the impact of the Intercredit Agreement.

10

IV

In the initial appeal, the district court held that the bankruptcy court's interpretation of the parties' stipulations conflicted with the bankruptcy court's analysis of the Intercredit Agreement. The conflict existed because the bankruptcy court held that the parties' stipulations concerning the Intercredit Agreement implied a partial assignment of security interest by Scurlock to BBL, but that the Intercredit Agreement, which was not part of the record at that time, constituted a subordination agreement. The district court therefore remanded the case to be supplemented with the Intercredit Agreement and directed the bankruptcy court to determine whether the Intercredit Agreement was a partial assignment or a subordination agreement.

The Trustee argues that the district court erred in holding that the bankruptcy court should not have accepted the parties' trial stipulations about the Intercredit Agreement. There are two stipulations at issue. Stipulation 6 provided that the first lien Scurlock had on El Paso's collateral was also held by BBL pursuant to an Intercredit Agreement, which provided that the first lien position was shared on a ratable basis. Stipulation 18 provided that, for the purposes of this adversary proceeding only, Scurlock and BBL held perfected security interests in El Paso's collateral and that they shared in this collateral in the following proportion, 54.53% to Scurlock and 45.47% to BBL.

11

Generally, stipulations in a pretrial order bind the parties, absent modification.  See Save Barton Creek Ass'n v. Federal Highway Admin., 950 F.2d 1129, 1132 n.3 (5th Cir. 1992).  Federal Rule of Civil Procedure 16 provides that a pretrial order controls the subsequent course of the action, unless modified to prevent manifest injustice.  The Trustee argues that Scurlock failed to show any circumstances to warrant disregard of the stipulations and that the bankruptcy court's commentary about the stipulations should be regarded as dicta.

A trial judge has "broad discretion in determining whether or not a pretrial order should be modified or amended."  Coastal States Mktg., Inc. v. Hunt, 694 F.2d 1358, 1369 (5th Cir. 1983).  Although a trial court generally does not need to make findings on stipulated facts, it may have to make a finding if conflicting inferences can be drawn from the undisputed facts.  See 9A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2579 at 541-42 (2d ed. 1995).

Here, the district court found conflicting inferences and exercised its discretion to make further findings.  We find that the district court did not err in directing the bankruptcy court to supplement the record with the Intercredit Agreement and interpret the stipulations accordingly.

V

On remand, the bankruptcy court determined that the Intercredit Agreement was a partial assignment and that the

12

stipulations accurately represented the partial assignment nature of the Intercredit Agreement. The bankruptcy court concluded that, by virtue of the partial assignment in the Intercredit Agreement, Scurlock received a greater percentage of recovery than it would have in a bankruptcy proceeding. Specifically, the bankruptcy court held that 54.53% of the total proceeds were indisputably Scurlock's, and its receipt of that proportion of the proceeds was not a preferential payment. The remaining 45.47% of the proceeds, however, were the subject of another creditor's security interest--that of BBL. When Scurlock received those monies, it received monies not sheltered by the source rule, which protects only transfers of a given creditor's own collateral. Thus, the bankruptcy court held that Scurlock recovered a greater percentage than it otherwise would have received in a Chapter 7 liquidation (in which the stipulation of the parties regarding BBL's security interest would be enforced). The bankruptcy court therefore ruled that the Trustee established the fifth element of § 547(b), greater percentage recovery, with respect to 45.47% of the transfers made to Scurlock during the preference period. The district court affirmed.

Scurlock argues that the bankruptcy court's interpretation of the Intercredit Agreement as a partial assignment was erroneous. Scurlock claims that the Intercredit Agreement was an agreement to modify contractually the relative lien positions of Scurlock, BBL, and the other term lenders. Scurlock also maintains that the

13

collateral sharing contemplated by the Intercredit Agreement did not occur until declaration of default and asserts that BBL never made a claim for any percentage of the $82 million paid during the preference period.

We now examine the Intercredit Agreement to determine whether it was indeed a partial assignment or merely a subordination agreement. Before the 1991 amended Intercredit Agreement, Scurlock had a perfected first lien and BBL had an independently perfected second lien in the proceeds of the common collateral. The Intercredit Agreement changed this relationship by providing, in pertinent part, the following:

> **4(f)** Subject to Sections 4(b) and (c) hereof, the security interests, liens, and other interests . . . at any time granted to or held by (I) [BBL] and (ii) [Scurlock], in the Common Collateral and the Common Secondary Collateral shall be and remain at all times and in all respects of equal priority subject to Section 4(g) and 4(h) hereof.

> **4(g)** Subject to Sections 4(b) and (c) hereof, all proceeds resulting from any sale, disposition, or other realization upon any or all of the Common Collateral or the Common Secondary Collateral occurring at any time after [BBL, Scurlock or the Term Lenders], as the case may be, shall have demanded payment under, declared a default or Event of Default under or exercised any enforcement remedies under the [BBL] Loan Documents, the [Term Lenders] Loan Documents or the [Scurlock] Loan Documents shall be shared by [BBL] and [Scurlock] pro rata in accordance with the outstanding principal of the [BBL] Debt and the [Scurlock] Debt (the "Pro Rata Allocation").

The dispute here is whether the Intercredit Agreement assigns part of Scurlock's security interests to BBL or only modifies their relative lien positions through a private sharing arrangement.

Contract interpretation is a matter of law reviewed by this court de novo.  See Liberty Mut. Ins. Co. v. Pine Bluff Sand & Gravel Co., Inc., 89 F.3d 243, 246 (5th Cir. 1996).  Our primary concern is to give effect to the true intentions of the parties as expressed in the written agreement.  See Burns v. Exxon Corp., 158 F.3d 336, 340 (5th Cir. 1998).  Absent ambiguity, the writing alone will be deemed to express the intention of the parties, and objective intent rather than subjective intent controls.  See id. (citing Sun Oil Co. v. Madeley, 626 S.W.2d 726, 728 (Tex. 1981)).

The two subsections in dispute are in a section of the Intercredit Agreement entitled "Agreement to Subordinate."  There are no terms of conveyance in subsections 4(f) and (g) assigning a portion of Scurlock's secured interest to BBL.  Rather, subsection 4(k) of the Intercredit Agreement provides that BBL and Scurlock "hereby consent to the modifications of their respective lien priorities as effected by this agreement."  This language reads as a subordination agreement rather than a partial assignment.

The Trustee's attempt to characterize the Intercredit Agreement as an assignment because it was filed at the Texas Secretary of State's office is not persuasive.  While § 9.405(a) of the Tex. Bus. & Com. Code provides that a secured party may assign of record all or part of its rights under a financing statement by the filing in the Secretary of State's office of a separate written statement of the assignment, the act of filing does not generate authority for the Trustee to enforce the Intercredit Agreement.

15

Scurlock argues that it merely subordinated its first lien position to BBL in relation to their claims to the Common Collateral in the event of a default. It stresses that there is nothing to suggest that it assigned its underlying debt to BBL, and a lien is not subject to an assignment without the underlying debt. See Svancina v. Gardner, 905 S.W.2d 780, 783 (Tex. App.--Texarkana 1995, no writ). Indeed, the Trustee concedes, as it must, that Scurlock did not assign its debt to BBL, and BBL did not assign its debt to Scurlock. Again, this circumstance favors a reading of the Intercredit Agreement as a subordination agreement.

In Section 26, entitled "No Third Party Beneficiaries," the Intercredit Agreement provides that BBL, Scurlock, and the Term Lenders entered into this agreement "for their mutual convenience" and "not for the benefit of El Paso." The parties to the Intercredit Agreement further provided that the agreement "is intended to establish relative rights and priorities between" them. El Paso signed a consent form acknowledging the Intercredit Agreement and consenting to the following:

> [A]ny agreement among you providing for the alteration or **modification of the priorities of the respective liens**, security interests and/or mortgages held by each of you and to any agreement among you with respect to the order of distribution among you of proceeds of any collateral subject to such liens, security interests and/or mortgages.

This language further suggests that the Intercredit Agreement was a subordination agreement and not a partial assignment.

16

The consent language also makes plain that the Intercredit Agreement gave neither El Paso nor its Trustee standing to enforce its terms because they were not a party to the agreement. See 11 U.S.C. § 510(a); In re Terrace Gardens Park Partnership, 96 B.R. 707, 716 (Bankr. W.D.Tex. 1989). Despite the Trustee's insistence that, irrespective of the label given to the Intercredit Agreement, Scurlock and BBL shared a first lien priority on the Common Collateral mandating that the proceeds from the Common Collateral be shared with BBL in a chapter 7 liquidation, we find the Trustee has no standing to assert such a claim for BBL, as the bankruptcy court correctly acknowledged in its original opinion. Specifically, the Trustee cannot enforce the agreement's sharing arrangement and cannot rely on it to demonstrate greater recovery by Scurlock.

We are ultimately persuaded that the Intercredit Agreement is a subordination agreement treating the order of distribution between the parties who executed it. The Intercredit Agreement describes the parties' intent to share pro rata, according to the outstanding debt, the proceeds of common collateral in the event of a declaration of default. There is no evidence that BBL sought to recover any percentage of the $82,000,000 that was paid to Scurlock during the 90 days preceding bankruptcy filing and no evidence that any such right would belong to anyone else.

That said, the parties' affairs do not easily give up their full meaning – at least from what we have before us. If Scurlock

17

received more than that to which it was entitled according to its agreement with BBL, the ball rests with BBL, not the Trustee of El Paso.

Given this conclusion and the fact that the source of all of the prepetition payments to Scurlock from El Paso were proceeds from collateral in which Scurlock held a secured interest, we find that Scurlock did not receive a greater percentage of recovery than it would have in a bankruptcy proceeding. Therefore, the Trustee has failed to establish the fifth element of § 547(b), which requires a trustee to show that a creditor received a greater percentage then he would have in a bankruptcy proceeding. Accordingly, we hold that Scurlock did not receive any preferential payments from El Paso. The district court is REVERSED, and the Trustee/debtor takes nothing.